791 F.2d 267
 24 ERC 1449, 54 USLW 2605, 16 Envtl.
L. Rep. 20,750
 MODINE MANUFACTURING CORPORATION, Petitioner,
v.
Morris KAY, Regional Administrator, Region VII, U.S.
Environmental Protection Agency and U.S.
Environmental Protection Agency, Region
VII, Respondents in No. 85-3397,
Judith E. Ayres, Regional Administrator, Region IX, U.S.
Environmental Protection Agency, and U.S.
Environmental Protection Agency, Region
IX, Respondents in No. 85-3496,
Valdas V. Adamkus, Regional Administrator, Region V, U.S.
Environmental Protection Agency, and U.S.
Environmental Protection Agency, Region
V, Respondents in No. 85-3509.
 Nos. 85-3397, 85-3496 and 85-3509.
 United States Court of Appeals,
Third Circuit.
 Argued April 15, 1986.
Decided May 27, 1986.
 
 Richard J. Kissel, M. Therese Yasdick, Daniel F. O'Connell, Joseph S. Wright (argued), Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for petitioner.
 F. Henry Habicht, II, Asst. Atty. Gen., Land and Natural Resources Div., Margaret N. Strand, Carl Strass, U.S. Dept. of Justice, Lee C. Schroer (argued), U.S.E.P.A., Francis S. Blake (of counsel), Gen. Counsel, Colburn T. Cherney, Susan G. Lepow, U.S.E.P.A., Washington, D.C., for respondents.
 Before ADAMS, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 These petitions require the Court to determine whether it has jurisdiction to review directly administrative interpretations of regulations promulgated under the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1251 et seq. (1982). If such jurisdiction exists, we then must consider the propriety of the agency's rulings.
 
 
 2
 The Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, covers direct dischargers who send waste into navigable waters, and indirect dischargers who emit waste into sewer systems and publicly owned treatment works (POTWs). For the latter group, the Administrator of the United States Environmental Protection Agency (EPA) promulgates "pretreatment standards" requiring treatment of certain pollutants by a private concern before the waste is discharged.
 
 
 3
 In this proceeding, Modine Manufacturing Corp., a producer of automobile radiators and other heat transfer products, challenges the application to seven of its facilities of certain pretreatment standards. Three EPA Regional Administrators concluded that the Modine facilities perform brass cleaning, considered by EPA a "bright dipping" operation, and that brass dipping is subject to categorical pretreatment standards for electroplating and for metal finishing.[1] Contending that it is exempt from these standards, Modine filed a petition for review in this Court. In addition, separate petitions for review filed by Modine in the Courts of Appeal for the Seventh and Eighth Circuits were transferred here.
 
 
 4
 The threshold issue is whether a court of appeals has jurisdiction to afford direct review of agency applications of categorical pretreatment standards, or whether a prior review in the district court is required. We conclude that court of appeals jurisdiction does exist to entertain a direct review, and, on the merits, that the agency did not err in its interpretation of its regulations. Accordingly, Modine's petitions for review will be denied.
 
 I.
 
 5
 Authority of the Administrator to issue pretreatment standards is set forth in Sec. 307(b) of the Act, 33 U.S.C. Sec. 1317(b) (1982). The first question we address is whether this Court has jurisdiction under Sec. 509(b)(1) of the Act, 33 U.S.C. Sec. 1369(b)(1) (1982), to entertain a petition for direct review of the agency's application of these standards in individual cases.
 
 
 6
 In general, the Act divides responsibility for judicial review between the district courts and the courts of appeals. The district courts, for example, are authorized to hear enforcement actions brought by EPA seeking civil or criminal penalties, Sec. 309, 33 U.S.C. Sec. 1319, and citizen suits against the Administrator for failure to perform an act or duty not within his discretion, or against any person alleged to be in violation of the Act, Sec. 505, 33 U.S.C. Sec. 1365. In contrast, Sec. 509(b)(1) of the Act provides, in relevant part:
 
 
 7
 Review of the Administrator's action ... (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal district in which such person resides or transacts such business upon application by such person.
 
 
 8
 None of the provisions for judicial review is clearly applicable to the Administrator's actions in the Modine proceedings. These proceedings arose out of Modine's request for rulings on whether categorical pretreatment standards promulgated by the agency apply to certain facilities performing bright dipping. Such requests are permitted by the agency's regulations.
 
 
 9
 Within 60 days after the effective date of a Pretreatment Standard for a subcategory under which an Industrial User may be included, or within 60 days after the FEDERAL REGISTER notice announcing the availability of the technical development document for that subcategory, whichever is later, the existing Industrial User or POTW may request that the Enforcement Division Director or Director, as appropriate, provide written certification on whether the Industrial User falls within that particular subcategory.
 
 
 10
 40 C.F.R. Sec. 403.6(a)(1) (1985). Both Modine and the EPA maintain that the rulings by the agency on the applicability of pretreatment standards are tantamount to the promulgation of standards, and are therefore reviewable directly in the courts of appeals pursuant to Sec. 509(b)(1)(C) of the Act. The contrary argument is that the Act allows direct review in the appellate courts only of initial promulgations, and not subsequent interpretations of regulations. If this argument is correct, jurisdiction to review the agency's interpretation would be in the district court, either under federal question jurisdiction, 28 U.S.C. Sec. 1331 (1982), or in an enforcement proceeding brought by EPA against Modine, 33 U.S.C. Sec. 1319 (1982). To our knowledge, no court has addressed the jurisdictional implications of the Sec. 403.6(a) procedure.
 
 
 11
 The Supreme Court favors a liberal interpretation of statutes providing for judicial review of administrative action. In Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Court declared "that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Id. at 140, 87 S.Ct. at 1511. It is true that this expansive statement was made in a case implicating the district court's federal question jurisdiction; a court of appeals has no jurisdiction absent its own statutory mandate. Lancellotti v. Office of Personnel Management, 704 F.2d 91, 97 (3d Cir.1983). But where, as here, a statute allows for some appellate review of agency action, the Supreme Court has applied a corollary of the Abbott rule, deciding that such jurisdictional provisions should be construed generously absent clear and convincing evidence of a contrary congressional intent. See, e.g., Lindahl v. Office of Personnel Management, --- U.S. ----, ----, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985); see also PBW Stock Exchange, Inc v. SEC, 485 F.2d 718, 738-39 (3d Cir.1973) (Adams, J., dissenting), cert. denied, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974).
 
 
 12
 Not only has the Supreme Court favored a liberal view of jurisdiction in administrative cases, but it has recently emphasized that direct review in the courts of appeals is generally preferred to initial district court review. "Absent a firm indication that Congress intended to locate initial [Administrative Procedure Act] review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." Florida Power & Light Co. v. Lorion, --- U.S. ----, ----, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). Where the agency has already compiled an administrative record, the Supreme Court explained, district court fact-finding is unnecessary, and district court review in such a situation is both a needless and time-consuming duplication of the ultimate appellate consideration. Furthermore, if a statute is construed to provide appellate review of some agency actions and district court review of related decisions, inefficient division of judicial resources may result. Id.
 
 
 13
 In considering the scope of a particular statute conferring jurisdiction on the courts of appeals to review agency actions, Florida Power mandated that a court must consider the legislative history, the statutory structure, and the general principles sketched above regarding the proper allocation of judicial authority to review agency determinations. Id. 105 S.Ct. at 1603.
 
 
 14
 The legislative history concerning Sec. 509(b)(1) is silent on whether EPA interpretations of promulgated standards are within the jurisdiction of the courts of appeals. See generally 1972 U.S. Code Cong. & Ad. News 3668 et seq. Thus, we discern no clear congressional intent to preclude such review. Moreover, the policies outlined in Florida Power favor jurisdiction by an appellate court over Modine's petitions.
 
 
 15
 EPA's interpretation mechanism for pretreatment standards, under Sec. 403.6(a)(1) of its regulations, provides an administrative record. In the present matter, no facts are in dispute. For the district court to afford initial judicial review, relying on the same record and applying the same standards that this Court would ultimately use, consequently would be "duplicative, wasteful and inefficient." Lindahl, 105 S.Ct. at 1636. Even if additional fact-finding were necessary, the proper procedure in either court would be to remand to the administrative agency. Florida Power, 105 S.Ct. at 1607; Harrison v. PPG Industries, Inc., 446 U.S. 578, 594, 100 S.Ct. 1889, 1898, 64 L.Ed.2d 525 (1980).
 
 
 16
 In addition, district court jurisdiction would needlessly bifurcate review of the agency's regulations. This Court clearly has statutory authority to consider challenges to the regulations as promulgated. See, e.g., Pennsylvania v. EPA, 618 F.2d 991 (3d Cir.1980). Consequently, whether this Court or the district court will consider the applicability of the standards to bright dipping would depend, according to the argument favoring initial district court review, on a fortuitous circumstance: whether the question was raised immediately upon promulgation or shortly thereafter in an individual request under 40 C.F.R. Sec. 403.6(a). Thus, if Modine had challenged agency regulation of bright dipping promptly upon announcement of the electroplating or metal finishing standards appellate jurisdiction would exist, but if it waited a few days and made an individual request we would have no jurisdiction, and the scope of the standards would be determined in separate proceedings. This seems an arbitrary and inefficient result.
 
 
 17
 The Supreme Court's decision in Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980) (per curiam), provides an appropriate analog. Under the Clean Water Act, EPA issues permits to direct dischargers (unlike Modine), or authorizes states to issue such permits. EPA may veto any portion of a state-issued permit. The question presented in Crown Simpson was whether an agency veto of a state-issued permit is reviewable in the courts of appeals under Sec. 509(b)(1)(F), authorizing direct review of actions "issuing or denying a permit." The Supreme Court held that even though a veto of a state-issued permit is not precisely a denial of a permit by the agency itself, direct appellate review should be accorded to either action. Otherwise, the Court explained, some cases will involve a time-consuming and duplicative consideration in the district court. Further, the choice of the proper forum to review similar issues would depend entirely on whether or not the state has a permit-issuing mechanism. "Absent a far clearer expression of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational bifurcated system." Id. at 197, 100 S.Ct. at 1095. See also Florida Power, 105 S.Ct. at 1606; Lindahl, 105 S.Ct. at 1637.
 
 
 18
 An arguably contrary approach was taken by the Court of Appeals for the District of Columbia Circuit in Utah Power & Light Co. v. EPA, 553 F.2d 215 (D.C.Cir.1977). That case involved the Clean Air Act which, like the Clean Water Act, authorizes court of appeals review of agency promulgations of state plans. The utility requested a ruling whether federal regulations incorporated into a state plan applied to three of its plants. The appellate court held it was without jurisdiction to consider interpretations of regulations, but could review only challenges to promulgation of the regulations themselves. It is not apparent from the opinion that the petitioner in Utah Power invoked an administrative procedure for obtaining clarifying interpretations comparable to that available to Modine here. In any event, Utah Power did not consider the doctrine of generous court of appeals review of agency action, and to the extent it is similar to the present matter we decline to follow it.
 
 
 19
 We hold that Sec. 509(b)(1)(C) affords jurisdiction to this Court to review directly the agency's interpretation of pretreatment standards applicable to indirect dischargers.[2] We therefore turn to the merits of these petitions for review.
 
 II.
 
 20
 Modine maintains that the electroplating and metal finishing regulations promulgated by EPA are not applicable to its operations. An understanding of Modine's objection requires a detailed description of the Clean Water Act and the administrative provisions implementing it.
 
 
 21
 In regulating direct dischargers, the Administrator first issued requirements for the best practicable control technology currently available (BPT). 33 U.S.C. Sec. 1311(b)(1)(A). Later, stricter standards were established, known as the best available technology economically achievable (BAT). Id. at Sec. 1311(b)(2). In the regulations governing indirect dischargers, the Administrator followed a similar timetable for issuing categorical pretreatment standards. First, he issued BPT-equivalent standards for electroplating, covering six primary operations. See 40 C.F.R. Pt. 413 (1985). Later, he promulgated stricter BAT-equivalent standards for metal finishing. See 40 C.F.R. Pt. 433 (1985). The latter category includes the six primary electroplating operations, plus forty other procedures. If a facility does not perform one of the primary operations, the metal finishing standards do not apply, even if the facility conducts any of the other forty functions. 40 C.F.R. Sec. 433.10(a). See also National Association of Metal Finishers v. EPA, 719 F.2d 624, 632-36 (3d Cir.1983) (a more detailed history of the Act, the regulations, and the electroplating and metal finishing standards), rev'd on other grounds sub nom. Chemical Manufacturers Association v. NRDC, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); NRDC v. U.S. EPA, 790 F.2d 289, 291-93 (3d Cir.1986).
 
 
 22
 Chemical etching is one of the six primary electroplating operations, 40 C.F.R. Secs. 413.60-.64 (1985), and, according to development documents published by EPA when it issued the electroplating and metal finishing standards, bright dipping is a type of chemical etching. Joint App. at 219, 227.[3] Thus, in EPA's view, since Modine engages in bright dipping it performs a primary electroplating operation, and is subject to the categorical pretreatment standards for both electroplating and metal finishing.
 
 
 23
 Modine, however, maintains that bright dipping is excluded from regulation.[4] It relies on Appendix D to the general pretreatment standards that apply to all indirect dischargers, regardless of their categories of operations. Appendix D is titled, "Selected Industrial Subcategories Exempted From Regulation Pursuant to Paragraph 8 of the NRDC v. Costle Consent Decree." 40 C.F.R. Pt. 403, App.D (1985). In NRDC v. Train, 8 Env't Rep. Cas. (BNA) 2120 (D.D.C.1976), amended sub nom. NRDC v. Costle, 12 Env't Rep. Cas. (BNA) 1833 (D.D.C.1979), amended sub nom. NRDC v Gorsuch, No. 72-2153 (D.D.C. Oct. 26, 1982), amended sub nom. NRDC v. Ruckelshaus, No. 73-2153 (D.D.C. Aug. 2, 1983 and Jan. 6, 1984), EPA entered into a consent decree regarding its adoption of clean water standards. Paragraph 8 of the decree permits EPA to exclude from regulation certain categories if there is adequate justification.
 
 
 24
 Appendix D, as published in the Code of Federal Regulations, purports to enumerate those industrial subcategories that "have been excluded from further rulemaking pursuant to paragraph 8 of the Natural Resources Defense Council v. Costle Consent Decree...." It lists bright dipping as one of these subcategories. According to Modine, the unambiguous language of this regulation resolves this case, and mandates that pretreatment standards not be applied to its facilities that are employed in bright dipping.[5]
 
 
 25
 EPA responds that Appendix D was intended to apply only to plants, unlike Modine's, that emit streams containing two or more regulated pollutants. It points out that Appendix D is incorporated in the body of the regulations only in connection with the "combined wastestream formula." 40 C.F.R. Sec. 403.6(e) (1985). That formula refers to "dilute" wastestreams, listed in Appendix D, as those of less concern since they are generally considered to have no more than trace amounts of pollutants of concern. The agency also states that in including bright dipping in Appendix D, and considering it a dilute wastestream, it made a mistake. It has proposed to amend the list to correct this error, see 50 Fed. Reg. 19,664 (1985), but insists that such an amendment of the appendix is not relevant to Modine's situation. Since EPA sees Appendix D as inapplicable to the electroplating and metal finishing standards challenged by Modine, the contents of that appendix both before and after the amendment are irrelevant in this matter.
 
 
 26
 Indeed, there is no reference to Appendix D in either the electroplating or metal finishing regulations. Given that the development documents reflect the agency's clear intent to include bright dipping within those regulations, EPA urges that it is wrong to read Appendix D so as to defeat this result.
 
 
 27
 Modine disagrees with this analysis. It maintains that the combined wastestream formula uses Appendix D for the same reason that the functions listed there were exempted from regulation under paragraph 8 of the consent decree: the wastestreams entail no more than trace amounts of pollutants and need not be regulated. Thus, the use of Appendix D for purposes of the combined wastestream formula is not at odds with the other use of Appendix D dictated by its clear language. This view is supported by the preamble to the general pretreatment regulations published in the Federal Register, which discloses that the definition of "dilute" for purposes of the combined wastestream formula "has carefully specified which of those streams exempted from regulation pursuant to paragraph 8 of the Consent Decree are dilute streams." 46 Fed. Reg. 9421 (1981).
 
 
 28
 EPA attempts to explain the confusion by demonstrating that it never intended to exclude bright dipping from regulation, despite the statement in Appendix D to the contrary. It points to a May 10, 1979 affidavit it filed pursuant to the consent decree, in which it proposed to "defer" stricter BAT-equivalent regulation of bright dipping. App. to Respondents' Brief at B-9. Apparently, the official who prepared Appendix D overlooked the limited purpose of this affidavit. Nevertheless, EPA contends, since it promulgated BAT-equivalent standards for metal finishing in 1982 without again mentioning any deferral, bright dipping is covered by the 1982 regulations. However, as Modine notes, the affidavit was not included in the administrative record and thus should be of no weight before this Court. Florida Power, 105 S.Ct. at 1607.
 
 
 29
 It is unnecessary to reconcile completely these divergent views. We are charged with deference to EPA in the construction of the "complex" Clean Water Act, Train v. NRDC, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975), and this approach extends to an agency's interpretation of its own regulation unless that construction "is plainly erroneous or inconsistent with the regulation." Butler County Memorial Hospital v. Heckler, 780 F.2d 352, 355 (3d Cir.1985) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).
 
 
 30
 Clearly, there is substantial ambiguity as a result of the different assumptions apparently underlying Appendix D on the one hand, and the promulgation of the electroplating and metal finishing standards on the other. Indeed, the facially simple language of Appendix D is itself rendered uncertain since it is referenced and incorporated in the regulations only in respect to the combined wastestream formula.
 
 
 31
 Where there is a need to harmonize conflicting indications in the regulations, we must look first to the agency responsible for their promulgation. In this matter, EPA's explanation--that Appendix D refers only to the combined wastestream formula and that, consonant with its intent expressed in the development documents, the electroplating and metal finishing standards should apply to bright dipping--provides a coherent result, and "is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." Chemical Manufacturers Association v. NRDC, --- U.S. ----, ----, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). Therefore, we will sustain the agency's determination that the electroplating and metal finishing standards apply to the bright dipping operations performed at Modine's facilities.
 
 
 32
 Modine argues that since the agency is responsible for any ambiguity in the regulations the agency should not prevail. However, the issue before us is the proper interpretation of the regulations; the fairness of assessing civil and criminal penalties on the basis of these regulations is not raised in these petitions. Before obtaining judicial review of its interpretation, EPA did not attempt to apply its regulations in an enforcement action against Modine; thus the propriety of such an action is not at issue. Cf. Powell v. Heckler, 789 F.2d 176 (3d Cir.1986) (an agency's regulations must give fair notice of potentially adverse actions).
 
 III.
 
 33
 We hold that this Court has jurisdiction to entertain Modine's petitions for review. However, in accordance with the concept of judicial deference to agency interpretations of its own ambiguous regulations, those petitions will be denied.
 
 
 
 [1]
 The plants affected by the Regional Administrators' decisions are in LaPorte, Indiana, and Pemberville, Ohio, in EPA's Region 5; Jefferson City, Joplin, and Trenton, Missouri, and Emporia, Kansas, in Region 7; and Whittier, California, in Region 9
 
 
 [2]
 EPA sets forth an alternative basis for jurisdiction. It points out that one who discharges waste directly into navigable waters may apply for a permit to emit pollutants, and that EPA's issuance or denial of a permit is subject to direct review in this Court. Sec. 509(b)(1)(F). Even though EPA standards treat indirect dischargers categorically and not through individual permits, EPA argues that by analogy the individual application of categorical standards should also be reviewable. This is not an unreasonable argument. "The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." Abbott, 387 U.S. at 141, 87 S.Ct. at 1511 (quoting Jaffe, Judicial Control of Administrative Action 357 (1965)). However, given our conclusion that jurisdiction exists under Sec. 509(b)(1)(C), we need not consider alternative bases for granting review
 
 
 [3]
 In this appeal Modine does not challenge this administrative construction. This Court has relied previously on development documents as an expression of the agency's intent in the promulgation of pretreatment standards. See National Association of Metal Finishers v. EPA, 719 F.2d 624, 657-59 (3d Cir.1983) (references to development documents included in the appendix), rev'd on other grounds sub nom. Chemical Manufacturers Association v. NRDC, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985)
 
 
 [4]
 In a footnote in its brief, EPA suggests that Modine's contention is barred by principles of res judicata. In an earlier proceeding, this Court summarily denied Modine's petition for review of its challenge to the metal finishing regulations as promulgated. Modine Manufacturing Corp. v. Ruckelshaus, 770 F.2d 1073 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 525, 88 L.Ed.2d 457 (1986). Arguably, Modine impermissibly split its claim by reserving the bright dipping issue until the present time. EPA adds, however: "Since the Agency's category determinations are so clearly correct, the Court need not address any issues of reviewability." The affirmative defense of res judicata may be waived. Society Hill Civic Association v. Harris, 632 F.2d 1045, 1060 (3d Cir.1980), and EPA would appear to have done so. Given that Modine was not aware of EPA's particular ruling concerning Modine's facilities at the time it brought its broader challenge, we find it appropriate to resolve this matter on the merits
 
 
 [5]
 Modine also claims that EPA had notice of its position as early as October 26, 1982, when it sent a letter to the agency commenting on the proposed metal finishing standards. It wrote: "Fourteen of Modine's facilities would be affected by the proposed Metal Finishing Regulations, while only five are currently affected by the Electroplating Standards due to the exclusions under 40 CFR Part 403 Appendix D." As EPA notes, however, this statement did not identify the facilities Modine considered excluded or explain which of the functions listed in Appendix D was the basis of its claim