724 F.Supp. 1158 (1989)
UNITED STATES of America
v.
UNITANK TERMINAL SERVICE, Unitank, Inc. and DRT Industries, Inc.
Civ. A. No. 87-6793.
United States District Court, E.D. Pennsylvania.
October 31, 1989.
*1159 James G. Sheehan, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.
Barry Klayman, Philadelphia, Pa., for defendants.

OPINION AND ORDER
VAN ANTWERPEN, District Judge.
This action was brought by the United States of America on behalf of the Administrator of the United States Environmental Protection Agency ("EPA") seeking injunctive relief and civil penalties against defendants Unitank Terminal Service, Unitank, Inc. and DRT Industries, Inc., for violations of the benzene regulations of the National Emission Standard for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. Part 61, Subparts A, J and V, promulgated under Sections 112 and 114 of the Clean Air Act, 42 U.S.C. §§ 7412 and 7414.
Before me are Defendants' Motion for Summary Judgment and the Motion of the United States for Partial Summary Judgment in their favor. For the reasons given below, I will deny the Defendants' Motion, grant the government's Motion and enter partial summary judgment, on the issue of the applicability of the NESHAP benzene regulations to defendants' Philadelphia Terminal, in favor of plaintiff United States of America and against defendants Unitank Terminal Service, Unitank, Inc., and DRT Industries, Inc.
Summary judgment under Fed.R.Civ.P. 56 may only be granted if there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Before summary judgment may be granted it must be clear what the truth is, and any doubt as to the existence of a genuine issue of material fact will be resolved against the movant. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). At oral argument on October 5, 1989 all parties agreed that benzene is a dangerous carcinogen and that the stipulated facts before the court make the matter ripe for summary judgment.

FACTUAL BACKGROUND
Defendant Unitank Terminal Service ("Unitank") is a Pennsylvania general partnership which owns and operates a bulk liquid storage terminal at Allegheny and Delaware Avenues in the Port Richmond neighborhood of Philadelphia ("Terminal"). Unitank is owned jointly by defendants Unitank, Inc., a foreign corporation doing business in Pennsylvania and DRT Industries, Inc, a Delaware Corporation doing business in Pennsylvania.
The Terminal in on a thirty acre site and contains nearly one hundred storage tanks ranging in size from 30,000 gallons to 100,000 barrels. The total capacity of the Terminal, which has been in existence since 1955, is approximately 50 million gallons. It is serviced by ship, truck and rail.
Unitank handles a wide range of liquid commodities at the Terminal, ranging from foodstuffs to hazardous chemicals. Unitank does not manufacture any products, it merely provides services in the nature of a warehouseman to its customers.
Beginning on February 1, 1986, Unitank began transferring and storing 100% liquid benzene at the Terminal. The benzene is received by ship or barge, transferred by pipeline to storage tanks, and later transferred by pipeline to outbound carriers: ship, barge, truck or rail.
At any one time since February 1, 1986 only three or fewer storage tanks at the Terminal have been used for benzene. Overall, a total of five tanks have been used at one time or another.
In order to transfer the benzene, a pipeline system is used. The part of this system used to transfer benzene has included, at various times, between 18 and 59 valves, *1160 between 34 and 110 flanges and between one and three pumps. During transfer operations these are in contact with 100% liquid benzene. The pipeline system is cleared and cleaned after each use. As a result, the amount of time the pipeline system is in benzene service is relatively small, measured in terms of hours or days a month.
Nevertheless, the benzene throughput is substantial. For example, according to Attachment 3 to plaintiff's Motion, the actual benzene throughput for 1986 was 7,878,676 gallons[1]. According to Exhibit 16 to the joint Stipulations of Fact, the estimated throughput for 1987 would be 18 million gallons. Since this volume is moved into and out of the Terminal at separate times, the volume moved through the pipeline system is double the stated amount.
Each year since February 1, 1986, including this year, the Terminal has transferred and stored more than 1000 megagrams of 100% liquid benzene. In fact, each transfer operation exceeds 1000 megagrams.
Although defendants did not fully comply with the NESHAP benzene regulations prior to 1987, they did have certain procedures in place. Under these procedures whenever benzene was transferred at the Terminal, a supervisor or his designee walked the pipeline to visually inspect it for leaks. Any leaks were reported at once. Leaks which were detected were repaired as soon as practicable, usually within a few hours after detection. Unitank maintains records of these transfers, inspections and repairs.
Prior to an EPA inspection on April 17, 1987 the Terminal was not in full compliance with the NESHAP benzene regulations. Since then practices have been changed so that the Terminal is either in full compliance or nearly so.

REGULATORY BACKGROUND
Section 112(b) of the Clean Air Act, 42 U.S.C. § 7412(b), requires the EPA Administrator to publish a list of hazardous air pollutants and to prescribe emission standards for each pollutant on the list. Those standards are known as the National Emission Standards for Hazardous Air Pollutants or NESHAP. See 40 C.F.R. Part 61.
Section 112(c) of the Clean Air Act, 42 U.S.C. § 7412(c), provides that no hazardous air pollutant to which an emission standard applies may be emitted from any stationary source in violation of that standard.
Section 112(e)(1) of the Clean Air Act, 42 U.S.C. § 7412(e)(1), provides that if, in the judgment of the EPA Administrator, it is not feasible to prescribe or enforce an emission standard for control of a hazardous air pollutant, the EPA Administrator may instead promulgate a "design, equipment, work practice or operational standard, or a combination thereof, which in his judgment is adequate to protect the public health from such pollutant."
Section 112(e)(5) of the Clean Air Act, 42 U.S.C. § 7412(e)(5), provides that any such "design, equipment, work practice or operational standard, or any combination thereof" shall be treated as an emission standard for purposes of the provisions of the Clean Air Act.
Pursuant to § 112(b) of the Clean Air Act, 42 U.S.C. § 7412(b), the EPA Administrator has designated benzene as a hazardous air pollutant. 42 C.F.R. § 61.01 (1988), 42 Fed.Reg. 29332 (June 8, 1977).
On January 5, 1981, the EPA Administrator published a proposed rule and notice of public hearing for a national emission standard for benzene fugitive emissions. 46 Fed Reg. 1165 et seq. (Jan. 5, 1981) (Exhibit 2 to Defendants' Motion). The notice stated that the proposed standard would limit benzene emissions from new and existing fugitive emission sources "in the petroleum refining and chemical manufacturing industries." 46 Fed.Reg. at 1165.
The notice of proposed rulemaking described the proposed standard as follows:
"The proposed standard would apply to new and existing pumps, pipeline valves, compressors, safety/relief valves, open-ended valves, sampling connections, pipeline flanges, and product accumulator vessels in benzene service at petroleum *1161 refining and organic chemical manufacturing plants (excluding coke-oven by-product plants)."
46 Fed Reg. at 1166.
On June 6, 1984, the EPA Administrator promulgated the NESHAP benzene regulations as a "Final Rule" under the heading "National Emission Standards for Hazardous Air Pollutants; Benzene Equipment Leaks (Fugitive Emission Sources)" 49 Fed. Reg. 23498 et seq. (June 6, 1984) (Exhibit 7 to Defendants' Motion). The publication added Subparts J and V to part 61 of 40 C.F.R. The publication in the Federal Register contains an extensive explanatory section known as a preamble. The portion of the publication relevant to the issue of the applicability of the NESHAP benzene regulations to public storage facilities is as follows, beginning with the preamble:
"SUMMARY The Environmental Protection Agency (EPA) listed benzene as a hazardous air pollutant under Section 112 of the Clean Air Act on June 8, 1977 (42 FR 29332). A standard was subsequently proposed for benzene fugitive emission sources (46 FR 1165, January 5, 1981). This Federal Register notice responds to comments on and promulgates the standards for benzene fugitive emission sources.
EFFECTIVE DATE: June 6, 1984. Under Section 307(b)(1) of the Clean Air Act, judicial review of national emission standards for hazardous air pollutants (NESHAP) is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia circuit within 60 days of today's publication of these rules. Under section 307(b)(2) of the Clean Air Act, the requirements that are the subject of today's notice may not be challenged later in civil or criminal proceedings brought by EPA to enforce these requirements ...
* * * * * *
Summary of the Standard
"The standard applies to certain new and existing equipment in benzene service (i.e., equipment containing materials with a benzene concentration of 10 percent or more by weight) except those located in process units that produce benzene or benzene mixtures at coke by-product plants or at plant sites that are designed to produce or use benzene in quantities of 1,000 megagrams per year (Mg/yr) or less. Equipment covered by the standard include new and existing valves, pumps, compressors, pressure relief devices, sampling connection systems, open-ended valves or lines, pipeline flanges, product accumulator vessels and closed vent systems and control devices used to comply with the standard. The standard includes work practices and other requirements as provided by section 112(e) of the Clean Air Act and discussed in the preamble to the proposed rule (46 FR 1177).
Permission to use any alternative means of emission limitation will be granted after a notice is published in the Federal Register and an opportunity for a public hearing."
49 Fed.Reg. at 23498.
The preamble continues:
"Summary of Impacts of the Standard
The standard applies to certain equipment in benzene service. This equipment is used in the production of benzene and other chemicals and products, such as maleic anhydride, ethanol, and pharmaceuticals. The standard will affect equipment located in more than 200 existing process units and an expected 60 new process units by 1985."
49 Fed.Reg. at 23500.
Subpart J, effective June 6, 1984, reads as follows:
"Subpart J  National Emission Standard for Equipment Leaks (Fugitive Emission Sources) of Benzene
§ 61.110 Applicability and designation of sources
(a) The provisions of this subpart apply to each of the following sources that are intended to operate in benzene service: pumps, compressors, pressure relief devices, sampling connections, systems, open ended valves or lines, valves, flanges and other connectors, product accumulator *1162 vessels, and control devices or systems required by this subpart.
(b) The provisions of this subpart do not apply to sources located in coke by-product plants.
(c)(1) If an owner or operator applies for one of the exemptions in this paragraph, then the owner or operator shall maintain records as required in § 61.246(i)
(2) Any equipment in benzene service that is located at a plant site designed to produce or use less than 1,000 megagrams of benzene per year is exempt from the requirements of § 61.112.
(3) Any process unit (defined in § 61.241) that has no equipment in benzene service is exempt from the requirements of § 61.112.
(d) While the provisions of this subpart are effective, a source to which this subpart applies that is also subject to the provisions of 40 CFR Part 60 only will be required to comply with the provisions of this subpart.
§ 61.111 Definitions
As used in this subpart all terms not defined herein shall have the meaning given them in the Act, in Subpart A of part 61, or in Subpart V of part 61, and the following terms shall have the specific meanings given them:
"In benzene service" means that a piece of equipment either contains or contacts a fluid (Liquid or gas) that is at least 10 percent benzene by weight as determined according to the provisions of § 61.245(d). The provisions of § 61.245(d) also specify how to determine that a piece of equipment is not in benzene service.
Semiannual" means a 6-month period; the first semiannual period concludes on the last day of the last month during the 180 days following initial startup of new sources; and the first semiannual period concludes on the last day of the last full month during the 180 days after June 6, 1984 for existing sources.
§ 61.112 Standards.
(a) Each owner or operator subject to the provisions of this subpart shall comply with the requirements of Subpart V of this part.
(b) An owner or operator may elect to comply with the requirements of § 61.243-1 and § 61.243-2.
(c) An owner or operator may apply to the Administrator for a determination of an alternative means of emission limitation that achieves a reduction in emissions of benzene at least equivalent to the reduction in emissions of benzene achieved by the controls required in this subpart. In doing so, the owner or operator shall comply with requirements of § 61.244."
49 FR at 235213, 40 CFR §§ 61.110-112 (1988)

INVOLVEMENT OF THE INDEPENDENT LIQUID TERMINALS ASSOCIATION
Unitank is a member of the Independent Liquid Terminals Association ("ILTA"). One of the activities which ILTA performs on behalf of its members is to routinely monitor federal regulations and regulatory developments which might affect public storage terminals. One result of this activity is periodic reports distributed to ILTA membership.
In early 1981 ILTA began following the progress of the NESHAP benzene regulations proposed on January 5, 1981 in 46 FR 1165 et seq. The proposed regulations were creating confusion in the minds of the ILTA staff and among ILTA members. In early 1981 John Prokop, President and General Counsel of ILTA made two phone calls to the EPA office in Durham, North Carolina which had drafted the NESHAP benzene regulations. During the first of these an EPA representative said that the NESHAP benzene regulations as proposed did not apply to bulk liquid terminals. In the second conversation, the same EPA representative "said he was more certain that EPA would apply the fugitive emission rules to bulk liquid terminals". Following these phone conversations with EPA representatives, the ILTA published the following in its regulatory report dated February 6, 1981 (Affidavit of John Prokop (Prokop *1163 Affidavit first ¶ 7), Exhibit 38 to Defendants' Answer to Plaintiff's Motion):
"BENZENE FUGITIVE EMISSIONS FROM PUMPS AND VALVES at Petroleum refineries or Chemical Plants ... Although this regulation is directed at controlling benzene emissions from pumps and valves at petroleum refineries and chemical plants, it is applicable to other facilities, including bulk liquid terminals, which handle benzene in concentrations greater than 10 percent."

ILTA continued to follow the proposed regulations (Prokop Affidavit) ¶ 8), and published similar reports on September 7, 1982 and October 28, 1983 (Attachments 4 & 5 to Plaintiff's Motion).
On June 29, 1984, following the promulgation of the final NESHAP benzene regulations, the ILTA Technical Director called the EPA office in Durham, N.C. In this phone call, an EPA representative confirmed the understanding of the ILTA Technical Director that the Regulations did not apply to public storage terminals. On July 5, 1984, the same EPA representative called the ILTA Technical Director to say that he had been in error in his earlier statement, and that the Regulations did apply to bulk liquid terminals. Following this conversation, John Prokop, President and general Counsel of ILTA called EPA employee Gil Wood, the author of the Regulations, and discussed them with him. Mr. Wood maintained that the Regulations did apply to bulk liquid terminals, with Mr. Prokop arguing the contrary.
These conversations were reflected in the ILTA newsletters of June 30, 1984, in which ILTA reported that the Regulations did not apply, and of July 31, 1984, in which ILTA reported that the Regulations did apply. In its August 30, 1984 report the ILTA said:
"At issue is whether they [the Regulations] apply to piping, pumps, valves at bulk liquid terminals, as EPA orally claims."
(Prokop Affidavit, first ¶ 13 and Exhibit C thereto, ¶ 14)

EPA INTERPRETATION
EPA made a number of oral interpretations of the NESHAP benzene regulations before defendants began handling benzene at the Terminal on February 1, 1986. With the exception of the subsequently recanted early 1981 and June 29, 1984 phone conversations discussed above, these took the position that the Regulations applied to storage terminals. In addition, during that period, EPA made at least one written interpretation of the Regulations, under the circumstances discussed below.
On March 26, 1985 David McKee, Director Air Management Division, Region 5 of EPA wrote to Edward E. Reich, Director, Stationary Source Compliance Division of EPA requesting a written EPA position of whether the NESHAP benzene regulations applied to sources at benzene storage terminals. The question arose because the Ohio Environmental Protection Agency had encountered resistance in applying the standard to terminals and had requested a written opinion. In setting forth the issue, Mr. McKee said:
* * * * * *
"The benzene fugitive NESHAP applicability section, 40 CFR 61.110, says that the standard applies to nine types of sources in benzene service. However, it exempts equipment located at a plant site designed to produce or use less than 1,000 megagrams of benzene per year. Since terminals neither produce nor use benzene as those terms are commonly understood, one can infer that terminals are not subject. Another interpretation is that sources in benzene service anywhere are subject, and that there is no applicability cutoff for terminals since they neither produce nor use benzene. A third interpretation is that terminals in a sense "use" benzene and that any site designed to transfer at least 1,000 megagrams per year is subject.
Background materials for the benzene fugitive NESHAPS discuss and inventory petroleum refining and chemical manufacturing units, but not terminals (e.g., the proposal preamble, 46 FR 1165-7). In contrast, background materials for the *1164 withdrawn benzene storage tank NESHAPS do discuss and inventory terminals (e.g., the proposal preamble, 45 FR 83953)."
* * * * * *
Exhibit 12 to defendants' Motion for Summary Judgment.
In response, Mr. Reich wrote on October 17, 1985:
"After discussions among Regional, Headquarters, and Emission Standards and Engineering Division (EDED) staff and based on information in the June 1982 background information document for benzene fugitive emissions (EPA-450/3-80-032b; appendix C, pp. C9, C17 and C19, et seq.) and on an October 17, 1982 memo from the docket (Cole/Dimmick copy attached) concerning the basis for model D, I have concluded that 40 CFR 61, Subparts J and V do apply to sources in benzene storage terminals that are intended to operate in benzene service. This confirms Mr. Dimmick's oral reply to your staff, that the standard does apply to terminals. The transfer of benzene would be considered "production" or "use" within the meaning of 40 CFR § 61.110(c)(2). Therefore, any equipment in benzene service that is located at a storage terminal designed to transfer less than 1,000 megagrams of benzene per year is exempt from the requirements of 40 CFR 61.112.
From the above listed documents, it is clear that storage terminals were intended to be included as sources to which these subparts apply. It is also reasonable that benzene emissions emanate from equipment in benzene service and that such emissions occur irrespective of the process or operation associated with that equipment. Therefore, I can see no reason why storage terminals would not be covered by the standard."
Exhibit 13 to defendants' Motion for Summary Judgment.

DISCUSSION
The issue before me on these cross Motions for Summary Judgment is whether the NESHAP benzene regulations published in 40 CFR §§ 61.110-112 apply to Unitank's Terminal in Philadelphia.
A court must give deference to an agency's interpretation of its own administrative regulations. Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); United States v. Larionoff, 431 U.S. 864, 872-73, 97 S.Ct. 2150, 2155-56, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 15, 85 S.Ct. 792, 800, 13 L.Ed.2d 616 (1965). In Udall, for example, the Court said that to sustain an agency's interpretation,
"we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."
Udall at 16, 85 S.Ct. at 801. Rather,
"`the ultimate criterion is the administrative interpretation which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"
Id. at 16-17, 85 S.Ct. at 801. quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700. See also Mt. Joy Construction Co. Inc. v. Schramm, 486 F.Supp. 32, 35 (E.D.Pa) affirmed, 639 F.2d 774 (3rd Cir. 1980).
Deference to agency interpretation is particularly warranted when the construction involves specialized knowledge and expertise, such as in the very complex environmental area. Chemical Manufacturers Association v. NRDC, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); Chevron U.S.A. v. NRDC, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); Train v. NRDC, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1974) (upholding EPA's interpretation of the "complex" Clean Air Act).
The Third Circuit has acknowledged the complex nature of environmental statutes and regulations and the specialized knowledge and expertise necessary to construe them, and has therefore deferred to EPA's interpretations of its own regulations. For example, in Modine Manufacturing Corp. v. Kay, 791 F.2d 267 (3rd Cir.1986), plaintiff manufacturing company contested the *1165 application of certain Clean Water Act pre-treatment regulations to its facilities. As in the case at bar, the Modine company contended that EPA erroneously interpreted its own regulations to apply the kind of manufacturing operations engaged in by the company. In support of its contention, the company pointed to apparent inconsistencies in the background documents to the regulations concerning whether EPA intended to include the kind of manufacturing operations engaged in by the company. The court acknowledged the ambiguities in the regulations, but held it unnecessary to reconcile the differing interpretations of the company and EPA, stating:
"We are charged with deference to EPA in the construction of the `complex' Clean Water Act [citation], and this approach extends to an agency's interpretation of its own regulation unless that construction "is plainly erroneous or inconsistent with the regulation." [citation]
Modine, 791 F.2d at 273-74. See also Vineland Chemical Co. v. EPA, 810 F.2d 402, 409 (3rd Cir.1987); and American Iron and Steel Institute v. EPA, 543 F.2d 521, 525-26 (3rd Cir.1976).
In the case before me, the defendants do not challenge the validity of the NESHAP benzene regulations, only the validity of EPA's interpretation of the NESHAP benzene regulations in applying them to defendants' Philadelphia Terminal. Assuming that the regulations are consistent with the Clean Air Act, the court is to construe them to effectuate the central purpose of the enacting body. United States v. Christensen, 419 F.2d 1401, 1403 (9th Cir, 1969). The words used in regulations are to be given their plain and ordinary meaning. Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) and if possible all ambiguities are to be resolved in favor of an interpretation consistent with the statutory and regulatory scheme. See United Telecommunications, Inc. v. Comm'r of Internal Revenue, 589 F.2d 1383, 1390, (10th Cir.1978), cert. denied 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979). Consideration must be given to the practical effects of the interpretation. Christensen, supra, 419 F.2d at 1404.
Defendants rely on Wiggins Bros., Inc. v. Department of Energy, 667 F.2d 77 (Temp.Emer.Ct. of App.1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982) for the proposition that the preamble should be considered in construing a regulation to determine its meaning. In that case the preamble had become an issue on appeal because the district court had explicitly excluded consideration of the preamble in reaching a holding contrary to the agency interpretation of the regulation. The preamble contained definitions, not included in the regulation as published in the Code of Federal Regulations, which directly supported the agency interpretation.
In the case before me, the "Summary of the Standard" found in the preamble published in the Federal Register promulgating the final regulation, 49 Fed.Reg. 23498 et seq., (quoted earlier in this Opinion) is consistent with the EPA's interpretation of the regulation. Later in the preamble, under "Summary of the Impacts of the Standard", the following is found:
"The standard applies to certain equipment in benzene service. This equipment is used in the production of benzene and other chemicals and products, such as maleic anhydride, ethanol, and pharmaceuticals. The standard will affect equipment located in more than 200 existing process units and an expected 60 new process units by 1985."
49 Fed.Reg. 23500.
Defendants argue that words such as "production of benzene" and "process units" do not refer to terminal facilities. They argue that the quoted language introduces an ambiguity into the promulgation of the Regulations which conflicts with the EPA's interpretation. I will resolve any such ambiguity in favor of the EPA's interpretation. In doing so I give deference to EPA's interpretation and specialized knowledge. In doing so I also effectuate the legislative intent of the Clean Air Act:
"To protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and *1166 the productive capacity of the population."
42 U.S.C. 7401(b)(1).
Defendants have placed great reliance on the argument that the regulatory history of the NESHAP benzene regulations indicates an intention on the part of EPA to regulate processing facilities but not storage facilities. I have carefully examined their arguments, and the voluminous documentary support for those arguments.[2] The background documents do appear to focus on the producers and processors of benzene, rather than on storage terminals alone. Nevertheless, since 1981 (with the exception of two phone calls, discussed above), when questioned on whether the Regulations apply to storage facilities, EPA has uniformly asserted that the Regulations do so apply. I find that the history of the development of the Regulations, when viewed in the light most favorable to defendants, does introduce some ambiguity about EPA's original intention concerning the application of the Regulations. However, I must follow the decisional law and resolve any such ambiguity in favor of the agency interpretation unless that interpretation is clearly erroneous, or is arbitrary and capricious. In the case at bar, EPA's interpretation is not only not arbitrary and capricious, it makes sense. As noted in the October 17, 1985 response of Mr. Reich "[benzene] emissions occur irrespective of process or operation".
I have considered defendants' contentions concerning the effect the regulatory history has had on notice to defendants of EPA's intention concerning the application of the Regulations to their Philadelphia site. The record, as set forth in defendants' memoranda in support of their Motion or in opposition to plaintiff's Motion, and the exhibits thereto, shows that:
1) the development of the proposed NESHAP benzene regulations have been followed by ILTA since early 1981 (Prokop Affidavit ¶ 3);
2) the ILTA knew as early as 1981 of EPA's interpretation that the NESHAP benzene regulations would apply to storage terminals, and passed this information to its members (Prokop Affidavit, ¶¶ 4-7);
3) the final NESHAP benzene regulations were promulgated on June 6, 1984, nearly two years before defendants began to handle benzene at Unitank's Philadelphia site (Exhibit 7 to Defendants' Motion); and
4) the EPA's interpretation that the NESHAP benzene regulations as promulgated on June 6, 1984 applied to storage facilities, and that this interpretation posed a potential problem to ILTA members, was known to ILTA as early as July 5, 1984 and was communicated by ILTA to its members shortly thereafter (Prokop Affidavit, ¶¶ 9-13 (first) and Exhibit C thereto, ¶ 14).
5) ILTA was aware on July 5, 1984 that ILTA and its members had until August 6, 1984 to petition for review of the NESHAP benzene regulation promulgated on June 6, 1984 (See, Attachment 8 to plaintiff's Motion). Statutory provision for such a petition is found in Section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), cited in the Federal Register publication of June 6, 1984 (quoted above). The record does not disclose that any such petition was filed by or on behalf of ILTA or any of its members.
Based on this, I find that defendants knew, or should have known of EPA's intended application of the NESHAP benzene regulations prior to their handling of benzene at the Terminal. Having known of EPA's position, if they still had questions they could have taken action, formal or informal, to answer the questions before beginning to handle benzene at the Terminal.
I must also consider the practical effect of my ruling. The Terminal is located in a *1167 densely populated part of Philadelphia. Practically speaking, if dangerous benzene emissions reached this population it will matter little whether they came from a producer, a processor or a terminal. Furthermore, the effect of the Regulations is to enable EPA and other agencies to enforce good engineering and management practices at the Terminal and other similar facilities. At the present time, the Terminal is either in full compliance with the regulation or nearly so (Stipulation of Content of Record, ¶¶ 31-33, 35 & 39). Nevertheless EPA must have the ability to consistently enforce its regulations. Compliance must not rest solely on the good will of those who are regulated. Facilities which do comply should not have to compete in the marketplace with those which do not.
A holding that the regulation applies to defendants' Philadelphia Terminal will also create a potential liability in defendants' for damages for past non-compliance. A holding that the regulation does not apply to defendants' Philadelphia Terminal would place EPA in the position of not being able to enforce compliance. This could have a harmful effect on the public health at this and other similar facilities. The beneficial effects on the public health of a holding in favor of plaintiff greatly outweigh any detrimental effect on defendants. In short, EPA should be permitted to do its job, and carry out the will of the Congress as expressed in the Clean Air Act.
The language of the NESHAP benzene regulations, as they appear in the Code of Federal Regulations, shows that, on their face, they apply to defendants' Philadelphia Terminal.
Section 61.110, Applicability and Designation of Sources, says:
"(a) The provisions of this subpart apply to each of the following sources that are intended to operate in benzene service: pumps, valves, flanges ..."
Section 61.111, Definitions, says:
"In benzene service" means that a piece of equipment either contains or contacts a fluid (Liquid or gas) that is at least 10 percent benzene by weight ..."
Defendants concede that they have pumps, valves and flanges which, from time to time, are in contact with 100% benzene liquid.
Section 61.110 further provides:
"(b) The provisions of this subpart do not apply to sources located in coke by-product plants.
[(c)] (2) Any equipment in benzene service that is located at a plant site designed to produce or use less than 1,000 megagrams of benzene per year is exempt from the requirements of § 61.112.
[(c)] (3) Any process unit (defined in § 61.241) that has no equipment in benzene service is exempt from the requirements of § 61.112.
Unitank's Terminal is not located in a coke by-products plant. Unitank's Terminal is not located at a plant site designed to produce or use less than 1,000 megagrams of benzene per year, either because, as defendants contend, they do not produce or use benzene at all, or, as interpreted by EPA, the Terminal's throughput exceeds 1,000 megagrams of benzene a year. Unitank's Terminal is not a process unit with no equipment in benzene service. Therefore, none of the exceptions to the general application of § 61.110 apply to Unitank's Philadelphia Terminal.
Having resolved the issues in favor of the agency interpretation of the Regulations, I find that EPA's interpretation of the Regulations is correct. While the agency's intention as expressed in the regulatory history may be ambiguous, the EPA's interpretation that the Regulations apply to storage facilities is consistent with the plain language of the Regulations and the legislative purpose of the Clean Air Act. Consequently I further find that:
1. Defendants are each an owner or operator of sources that are intended to operate in benzene service, as those terms are used in 40 C.F.R. § 61.110, at the Unitank site located in the City of Philadelphia; and
2. No sources that are intended to operate in benzene service at the Unitank site are "located at a plant site designed to produce or use less than 1,000 megagrams *1168 of benzene per year" as that language is used in 40 C.F.R. § 61.110(c)(2).
NOTES
[1] A megagram of benzene is equal to approximately 300 gallons.
[2] The record in this case, according to a Stipulation of Content of Record filed June 14, 1989, contains, as relevant to the cross Motions for summary judgment, the extensive regulatory history of the NESHAP benzene regulations, and, related to those regulations, correspondence within EPA, correspondence between EPA and others, correspondence and memoranda by the ILTA, depositions of potential witnesses etc.