**BEAZER EAST, INC. Appellant,**

v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
REGION III.**

No. 91–1692.

United States Court of Appeals,
Third Circuit.

Argued Feb. 25, 1992.

Decided May 12, 1992.

**604**

Kenneth K. Kilbert (argued), Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, Pa., for appellant.

Barry M. Hartman, Acting Asst. Atty. Gen., Martin F. McDermott, Robert L. Klarquist, M. Alice Thurston (argued), Attys., U.S. Dept. of Justice, Washington, D.C., for appellee.

G. William Frick, Ralph J. Colleli, Jr., American Petroleum Institute, Washington, D.C., amicus curiae.

John C. Chambers, Jr., Gordon D. Quin, Gregory J. Madden, McKenna & Cuneo, Washington, D.C., for amicus curiae American Petroleum Institute.

Before: SLOVITER, Chief Judge,
SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Beazer East, Inc. appeals the district court's order granting summary judgment in favor of the Environmental Protection Agency. The EPA cited Beazer for four violations of Subtitle C of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6921 to 6939b (1983 & Supp 1991) (RCRA). Beazer contested these citations on the grounds that the subjects of the citations, its aeration basins, were not subject to RCRA regulation. We are presented with a single issue: whether Beazer's basins are "tanks" or "surface impoundments" for purposes of 40 CFR § 260.10. If we conclude that the basins are tanks, then they are exempt from RCRA's groundwater monitoring requirements. On the other hand, if the basins are surface impoundments, then they are subject to RCRA regulation.

This issue has two components: first, whether the EPA's interpretation of the "provide structural support" language in § 260.10 to require tanks to be completely self-supporting when removed from the ground and filled to capacity with the material they are intended to contain, was plainly erroneous or inconsistent with the regulation; second, whether the EPA's interpretation of the "designed to contain" language in § 260.10 to require tanks to be watertight was plainly erroneous or inconsistent with the regulation.

We conclude that the basins are surface impoundments and that the EPA's interpretation of the "provide structural support" language of § 260.10 is not plainly erroneous or inconsistent with the regulation. Hence, we do not reach the second component, the "watertight" test. We will affirm the district court's order granting summary judgment in favor of the EPA.

I.

Beazer, a Delaware corporation, operates a coal tar plant in Follansbee, West Virginia, where it produces creosote, coal tar products and industrial chemicals. Wastewater from the plant undergoes microbial treatment and is released into the Ohio river. This treatment system consists of two aeration basins.[1] Each basin has a capacity of 500,000 gallons. They are built into the ground, are 15 feet deep, approximately 80 feet across, and are constructed of six-inch thick reinforced concrete. The concrete overlies a two-inch thick layer of bank sand, which in turn overlies a three-inch thick layer of compacted crushed slag.

---

1. The term "basin" is a generic term which may be applied to either a "tank" or a "surface impoundment."

## II.

In 1987, EPA Region III filed an Administrative Complaint, Compliance Order, and Notice of Opportunity for Hearing against Beazer, charging it with four violations of RCRA groundwater monitoring requirements. First, the EPA charged that Beazer violated 40 CFR § 265.91(a)(1) by failing to maintain a monitoring well of sufficient depth to yield groundwater samples; second, that Beazer violated 40 CFR § 265.91(a)(2) by failing to maintain a monitoring well of sufficient depth to detect statistically significant amounts of hazardous waste; third, that Beazer violated 40 CFR § 265.92(a) by failing to develop and follow a groundwater sampling plan; and fourth, that Beazer violated 40 CFR § 265.93 by failing to prepare an outline of a groundwater quality assessment program.

Beazer requested a hearing before an administrative law judge to contest the citations. At the outset, Beazer and the EPA stipulated that the only issue to be decided by the ALJ was whether the two basins were "tanks" or "surface impoundments" within the definition of 40 CFR § 260.10. Section 260.10 defines a tank as follows:

> Tank means a stationary device, designed to contain an accumulation of hazardous waste which is constructed primarily of non-earthen materials (e.g., wood, concrete, steel, plastic) which provide structural support.

Section 260.10 defines surface impoundment as follows:

> Surface impoundment or impoundment means a facility or part of a facility which is a natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials), which is designed to hold an accumulation of liquid wastes or wastes containing free liquids, and which is not an injection well. Examples of surface

impoundments are holding, storage, settling, and aeration pits, ponds and lagoons.

The EPA and Beazer stipulated that if the basins are found to be surface impoundments, Beazer would pay a civil penalty of $30,000 and either comply with RCRA or close the basins.

After the EPA filed its Administrative Complaint, the parties moved for an accelerated decision by the ALJ. The ALJ denied this motion. In his Opinion and Order, the ALJ opined that the foundation test applied by the EPA to the definition of tanks was neither expressed nor implied in the 40 CFR § 260.10 definition of tanks. The ALJ also concluded that the EPA may have violated the Administrative Procedure Act, 5 U.S.C. § 551 to 559 (1977 & Supp 1991), by adopting the "Weddle memorandum,"[2] as the basis for its foundation test. The ALJ reasoned that the EPA had adopted a rule without subjecting it to the notice and comment procedures required by § 553 of the Administrative Procedure Act. The ALJ scheduled the matter for a full adjudicative hearing.

After hearing extensive testimony from both parties' experts, the ALJ reversed his position. In his Initial Decision, the ALJ concluded that the EPA's reliance on the Weddle memorandum for its foundation test and the EPA's watertightness test were both reasonable interpretations. He held that Beazer's basins did not meet the definition of tanks and were instead surface impoundments subject to RCRA groundwater monitoring requirements. The ALJ assessed a civil penalty of $30,000 against Beazer and entered an order to comply with RCRA monitoring requirements under 40 CFR § 260.90–93. Beazer appealed to the EPA Administrator.

On appeal, the EPA Administrator affirmed the ALJ. The Administrator did not discuss the agency's use of the Weddle

---

**2.** The "Weddle memorandum" was an internal EPA memo from the acting director of the agency's Washington, D.C., Office of Solid Waste to the Director of EPA Region IV. The memorandum distinguished a tank from a surface impoundment by "structural support." That is to say, if it were free standing, and filled to its design capacity with the material it was intended to hold, would the walls or shell of the unit alone provide sufficient support to maintain the structural integrity. If so, it can be considered a tank. If not, it is a surface impoundment.

memorandum. Instead, the Administrator concluded that both the foundation test and the watertightness test were compatible with the regulatory purpose underlying RCRA, that is, to protect groundwater from contamination by hazardous waste. The Administrator upheld the civil penalty and the compliance order against Beazer. Beazer appealed the Administrator's decision to the U.S. District Court. The district court granted the EPA's motion for summary judgment, concluding that the EPA's interpretation of § 260.10 was neither plainly erroneous nor inconsistent with the regulation.

### III.

■ We review the district court's summary judgment by applying the same standard used by the district court. *Childers v. Joseph,* 842 F.2d 689, 693 (3d Cir.1988); *Equimark Commercial Financial Co. v. CIT Financial Services Corp.,* 812 F.2d 141, 142 (3d Cir.1987). Because we are reviewing agency action, we shall decide all questions of law, interpret statutory provisions and determine the meaning or applicability of the terms of an agency action. 5 U.S.C. § 706. We can only set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

As a preliminary matter, Beazer disputes the standard by which we review this agency action. Citing our decision in *Bethlehem Steel v. OSHA,* 573 F.2d 157, 161–62 (3d Cir.1978) Beazer claims that the standard requires that "the agency's interpretation of a regulation cannot be upheld if the language of the regulation did not provide fair notice of what the regulation prohibits or requires." *Brief of Appellant,* at 17–18. As such, Beazer contends that the EPA must adhere to the formal "notice and comment" rulemaking procedures found in the Administrative Procedure Act, 5 U.S.C. § 553.

■ We disagree. Beazer's standard of review argument confuses the distinction between "legislative" rules and "interpretive" rules promulgated by an administrative agency. To be sure, "legislative" rules that impose new duties upon the regulated party have the force and effect of law and must be promulgated in accordance with the proper procedures under the APA. See *United Technologies Corp. v. EPA,* 821 F.2d 714, 718 (D.C.Cir.1987). The APA requires also that general notice of the proposed regulation be published in the Federal Register and interested persons be given an opportunity to comment on the proposed rule. 5 U.S.C. § 553(b),(e). "Interpretive" rules, on the other hand, seek only to interpret language already in properly issued regulations. *United Technologies,* 821 F.2d at 718 ("An interpretive rule simply states what the administrative agency thinks the [underlying] statute means, and only "reminds" affected parties of existing duties." quoting *Citizens to Save Spencer County v. EPA,* 600 F.2d 844, 876 n. 153 (D.C.Cir.1979)); See generally, Weaver, *Judicial Interpretation of Administrative Regulations: The Deference Rule,* 45 U Pitt L Rev 587, 589 n 13 (Spring 1984). Interpretive rules and statements of policy are exempted from the notice and comment requirement. 5 U.S.C. § 553(b)(A).

Here, the EPA is interpreting language already found in § 260.10. The agency is not adding or amending language to the regulation, hence it is not subject to notice and comment procedures. We will thus apply the arbitrary and capricious standard of review, guided as we must be, by the deference given an agency's interpretation of its own regulations. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

■ When we review an administrative agency's interpretation of its own regulations, we defer to the agency's construction of the language of its own regulation, "unless it is plainly erroneous or inconsistent with the regulation." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Bowles v. Seminole Rock and Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 1217 (1945); *Director, OWCP v. Mangifest,* 826 F.2d 1318, 1323 (3d Cir.1987). While we apply the "plainly erroneous" standard of review where the

meaning of the words in the regulation is in doubt or subject to different interpretations, *Butler County Memorial Hospital v. Heckler,* 780 F.2d 352, 355 (3d Cir.1985), we are not at liberty to allow the agency to imply language that does not exist in the regulation. *Director, OWCP v. Mangifest,* 826 F.2d at 1324; See also *Bethlehem Steel v. OSHA,* 573 F.2d at 161–62. We acknowledge the complex nature of environmental statutes and regulations and the specialized knowledge necessary to construe them, and therefore, subject to these limitations, defer to the EPA's interpretations of its own regulations. *Modine Mfg. Corp. v. Kay,* 791 F.2d 267, 273–74 (3d Cir.1986); *United States v. Unitank Terminal Service,* 724 F.Supp. 1158, 1164 (E.D.Pa.1989).

## IV.

The Resource Conservation and Recovery Act of 1976, as amended, was enacted to protect groundwater from contamination by solid and hazardous waste. Subtitle C of RCRA, 42 U.S.C. §§ 6921–6934, establishes "cradle-to-grave" regulations to assure that hazardous waste is safely treated, stored, and disposed. See generally, *United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 666–67 (3d Cir.1984). Section 3004(a) of RCRA, 42 U.S.C. § 6924(a), requires the EPA to "promulgate regulations establishing such performance standards [for hazardous waste facilities] ... as may be necessary to protect human health and the environment." These standards may include, but need not be limited to, requirements pertaining to reporting, monitoring and inspecting; location, design and construction; contingency plans, operational continuity and financial responsibility; and permit compliance. The state of West Virginia is authorized to administer a state hazardous waste program pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b). Its program incorporates the regulations at issue, but the EPA retains the authority to enforce those regulations under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a)(2).

The EPA has established minimum national standards for handling hazardous waste, by facilities operating on an "inter-

im status." See 40 CFR § 265.1. Facilities operating on an interim basis, like permitted facilities, are required to comply with all applicable performance standards under RCRA. Beazer operates its facility on an interim status, and hence is governed by the Interim Status Groundwater Monitoring requirements of 40 CFR part 265, subpart F. Section 265.90(a) requires the owner or operator of a surface impoundment containing hazardous waste to implement a groundwater monitoring program "capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility," except as provided in 40 CFR § 265.1. Section 265.1(c)(10), in turn, provides that such a groundwater monitoring program does not apply to "the owner or operator of an elementary neutralization unit or a *wastewater treatment unit* as defined in § 260.10 of this chapter." A wastewater treatment unit is defined as a device which:

(1) Is part of a wastewater treatment facility that is subject to a regulation under either section 402 or 307(b) of the Clean Water Act; and

(2) Receives and treats or stores an influent wastewater that is a hazardous waste as defined in § 261.3 of this chapter or that generates and accumulates a wastewater treatment sludge that is a hazardous waste as defined in § 261.3 or this chapter, or treats or stores a wastewater treatment sludge which is a hazardous waste as defined in § 261.3 of this chapter; and

(3) Meets the definition of *tank* or *tank system* in § 260.10 of this chapter.

40 CFR § 260.10 (emphasis added). Consequently, if a unit conforms to the definition of tank, it is not subject to a groundwater monitoring program under RCRA. Thus, we come to the question we must decide: whether Beazer's aeration basins are tanks or surface impoundments.

## V.

It is undisputed that Beazer did not have an adequate groundwater monitoring program to detect leaks from its aeration basins. Beazer argues that it is not subject

to RCRA because its basins are tanks, not surface impoundments. Beazer first contends that the EPA's interpretation of § 260.10, the foundation test requiring that tanks be designed to be self-supporting when removed from the ground and filled to design capacity with the material they were intended to contain, is erroneous under any standard of review. In addition, Beazer contends that the EPA's interpretation of § 260.10, requiring tanks to be watertight, is likewise erroneous under any standard of review.

## A.

Unlike a surface impoundment, by definition a tank must be constructed primarily of non-earthen materials (for example, wood, concrete, steel, or plastic) *and* those materials must provide structural support. 40 CFR 260.10. But how much structural support is necessary? The EPA has interpreted this regulation to require that a tank be able to support itself when removed from the ground and filled to capacity with the material it was intended to contain, and that non-earthen materials provide the *primary* structural support. There is no parallel structural support requirement for surface impoundments. Indeed, surface impoundments may consist of topographic depressions dug in the ground and lined with a man-made material.

Beazer concedes that if its basins were removed from the ground and filled to capacity with its wastewater, they would not be self-supporting. Nevertheless, Beazer argues that its concrete and welded wire fabric construction provides adequate support to satisfy the "provide structural support" language of § 260.10. Beazer contends that, by adopting the foundation test, the EPA imposed a new substantive requirement, thereby giving legislative effect to an internal agency memorandum without giving the regulated community an opportunity to oppose or comment upon the new standard.

The EPA counters that its interpretation of the "structural support" language of § 260.10 is not plainly erroneous or inconsistent with the regulation. The agency claims that its self-supporting requirement promotes the policy of RCRA. Tanks are subject to less stringent regulations than surface impoundments. It is therefore reasonable, the agency argues, for the EPA to require that they provide more protection to groundwater in the event the soil surrounding a tank shifts or the tank is subjected to potentially great natural forces.

In its Final Decision, the EPA Administrator reasoned as follow:

> An interpretation of the "structural support" language [of § 260.10], therefore must exclude basins that rely on the surrounding soil for structural support. The "self-supporting" interpretation urged by the Region is the only reading of the "tank" definition that addresses this concern. The "self-supporting" interpretation ensures that a device will be able to maintain its integrity even if the support provided by the surrounding soil is dissipated through settlement or some other change. Accordingly, the foundation test, which determines whether a basin is self-supporting, is not just a theoretical exercise, requiring tanks to perform under conditions that will never exist, as [Beazer] argues. Instead, the foundation test requires tanks to perform under conditions that very well might exist if the supporting soil settles or otherwise shifts.

*Final Decision of the EPA Administrator* at 12. While we disagree that the foundation test is the "only reading" of the regulation, we find this view to be a reasonable interpretation of the regulation.[3] See *Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (reviewing court need not conclude that the EPA's interpretation is the only permissible interpretation of the regulation, but that it is a "sufficiently rational" one). The

---

3. We accept that the official agency interpretation of § 260.10 is that developed through the adjudication process, rather than that generated through internal agency memoranda. See *Mar-tin v. OSHRC,* —— U.S. ——, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991) (an agency's interpretation of a regulation developed in an adjudication is entitled to deference).

EPA's interpretation of § 260.10 is therefore neither plainly erroneous nor inconsistent with the regulation.

Section 260.10 requires greater structural integrity from tanks than from surface impoundments. This requirement is consistent with the policy of protecting groundwater from hazardous waste. The EPA requires that other tanks subject to RCRA permitting requirements (for example, those regulated under Subpart J) be certified by an engineer to have "sufficient structural strength ... to ensure that it will not collapse, rupture or fall." 40 CFR 264.191(b). There is no reason to believe that the rupture or collapse of Beazer's wastewater treatment basin is any less hazardous to the groundwater than the rupture or collapse of other tanks within the scope of RCRA.

Moreover, a tank designed to be self-supporting will have stronger walls and tighter joints than a surface impoundment and will not have to rely on the surrounding soil for structural support. Hence, in the event the surrounding soil shifts, a tank will prevent hazardous waste from contaminating the groundwater. See 40 CFR 265.193(b)(1) (secondary containment systems must be "[p]laced on a foundation or base capable of providing support to the secondary containment system and resistance to pressure gradients above and below the system and capable of preventing failure due to settlement, compression, or uplift.")

■ Beazer argues that the regulation does not specify that anything more than "some" structural support is needed to come within the RCRA definition of tank. We note, however, that in the complex area of environmental regulation, the EPA must create bright lines to separate prohibited and permissible activity. We defer to this line-drawing provided the interpretation is both reasonable and consonant with Congress' intent. For example, in *Vineland Chemical Co. v. EPA*, 810 F.2d 402 (3d

Cir.1987), the EPA interpreted RCRA's provision requiring a regulated party to certify that it is financially responsible. 810 F.2d at 409. While recognizing that the statute was somewhat ambiguous, we nevertheless deferred to the agency's interpretation because it clarified RCRA's regulation in a manner consistent with Congress' intent to accelerate the EPA's enforcement activities under RCRA. *Id.* In like manner, the foundation standard gives meaning to the operative language of § 260.10, thereby creating a bright line by which the EPA may determine which wastewater facilities are subject to groundwater monitoring requirements.

■ Beazer also contends that, even assuming the reasonableness of the EPA's interpretation, regulated parties were not provided adequate notice that tanks must be self-supporting when removed from the ground and filled to capacity. But it is a basic tenet of administrative law that agencies have some discretion to chose between adjudication and rulemaking when interpreting statutes and regulations committed to their authority, *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 476–79, 102 L.Ed.2d 493 (1988) (Scalia, concurring); *NLRB v. Bell Aerospace*, 416 U.S. 267, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974), subject only to the limitations imposed by Congress. *Chemical Mfrs. Ass'n*, 105 S.Ct. at 1107; *Martin*, 111 S.Ct. at 1177. The Administrative Procedure Act does expressly prohibit an agency from retroactively imposing an interpretive rule upon a regulated party. See for example 5 U.S.C. § 551(4) (agency rules can only have prospective effect). Nonetheless, nothing in the APA prohibits an agency from adopting or revising an interpretation of a regulation that has been properly promulgated in an adjudication and applying that interpretation retroactively. *Bowen*, 109 S.Ct. at 476; *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).[4] If the agency affords the party a "full opportunity to be heard

---

4. However, courts will not allow retroactive application of an agency adjudication where doing so would result in "manifest injustice." *See District Lodge 64, Int'l Ass'n of Machinists &*

*Aerospace Workers*, 949 F.2d 441, 446–49 (D.C.Cir.1991); *Consolidated Freightways v. NLRB*, 892 F.2d 1052, 1058 (D.C.Cir.1989).

before the [agency] makes its determination" *Bell Aerospace*, 94 S.Ct. at 1772, we cannot second-guess the agency decision whether to interpret a standard by rulemaking or by adjudication. *Chenery*, 67 S.Ct. at 1580.

Beazer contends the EPA never gave it adequate notice because the EPA never gave meaning to the clause "provide structural support" in § 260.10. Unlike its challenge to the EPA's use of the term "to contain," Beazer does not contend that the EPA has inconsistently interpreted what level of structural support is necessary for a basin to be considered a tank. Instead, Beazer contends that it was wronged when the EPA imposed a completely new standard. We disagree. This is not a situation where the agency inconsistently interpreted a standard over time or changed its interpretation. See *Chemical Mfrs. Ass'n*, 105 S.Ct. at 1112. Rather, the EPA is making a reasonable attempt to fill the interstices of a complex regulatory scheme by giving meaning to regulatory language entirely within its authority to define. See, for example, *Vineland Chemical Co.*, 810 F.2d at 409; *Modine Mfg. Corp.*, 791 F.2d at 273–74. It is of little consequence that the EPA's interpretation is new.[5] Indeed, even if the EPA's interpretation of the "provide structural support" language of § 260.10 was developed for the first time in an agency adjudication, we would give the agency no less deference than if it had promulgated an interpretive rule.[6] See *Martin*, 111 S.Ct. at 1179–80.

 In conclusion, we will not question the EPA's choice to give meaning to the "structural support" language of § 260.10 through adjudication rather than rulemaking. As Justice Scalia has recently said, "where legal consequences hinge upon the interpretation of statutory re-

quirements, and where no preexisting interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication." *Bowen*, 109 S.Ct. at 480 (Scalia, concurring). That is precisely the case here. Rather than amending a preexisting interpretation of § 260.10, the EPA is developing its interpretation through adjudication. Beazer contends the EPA must comply with the notice and comment procedures applicable to agency rulemaking, i.e., advance notice published in the Federal Register. But no such notice is required where the agency proceeds by adjudication. Therefore, Beazer's contention that it was not given adequate notice of the EPA's interpretation fails.

Last, the ALJ found that Beazer presented sufficient evidence to establish that its aeration basins are of rigid construction, but agreed with the EPA that if removed from the ground the basins would collapse. The ALJ also found that Beazer's basins rely in large part upon the surrounding soil (earthen, rather than non-earthen material) for structural support, and therefore were properly characterized as surface impoundments rather than tanks. These findings were supported by substantial evidence and cannot be disturbed. Consequently, the EPA's interpretation of the "structural support" language in § 260.10 is neither plainly erroneous nor inconsistent with the regulation, and its finding that Beazer violated RCRA groundwater monitoring requirements was supported by substantial evidence.

## B.

Beazer next argues that the EPA erroneously interprets the term "to contain" in § 260.10, to mean that tanks must be designed to be watertight. Beazer points out that the EPA has inconsistently used the terms "to contain" and "to hold" over the

---

**5.** The EPA has previously considered its interpretation of the "provide structural support" language found in § 260.10 in a recent adjudication, but there the agency was presented with a different factual setting. See *In the Matter of Brown Wood Preserving Co.*, No. RCRA–84–16–R, Final Decision of the EPA Administrator (May 3, 1989).

**6.** This is not to say that an agency's interpretation of one of its regulations, developed in an adjudication, is always entitled to deference. For example, if the agency's interpretation is "wholly unsupported by regulations, rulings, or administrative practice," *Bowen*, 109 S.Ct. at 473, we will not defer. See also *Martin*, 111 S.Ct. at 1179. Here, the EPA's interpretation is amply supported by the regulatory context.

course of its enforcement of RCRA; at times synonymously, and at other times requiring greater liquid containment under "to contain" than under "to hold." As a result of this alleged inconsistent enforcement history, Beazer contends that it did not have fair notice of what conduct is actually prohibited under § 260.10. We do not reach this issue because Beazer's basins do not meet the structural support requirement under § 260.10, a necessary predicate for a basin to be considered a tank.[7]

## VI.

We conclude that the EPA's interpretation of § 260.10, requiring tanks to be self-supporting when removed from the ground and filled to capacity with the material they were intended to contain, is not plainly erroneous and is consistent with the plain language of the regulation. This interpretation establishes a bright line rule for the regulated industry and promotes the important environmental policy underlying the Resource Conservation and Recovery Act. Since Beazer fails to meet RCRA standards under the foundation test that its basins are surface impoundments, we do not decide whether the EPA's distinction between the terms "to hold" and "to contain" in § 260.10 is reasonable. The EPA's Final Order enforcing the Administrative Complaint and the civil penalties assessed against Beazer was not arbitrary or capricious. We will therefore affirm the district court's order granting the EPA's motion for summary judgment.

---

**7.** We note that there is little guidance in the regulations or in the Federal Register that points to a clear distinction between "to hold" and "to contain" as used in RCRA. While it may be true that the EPA's interpretation of these terms accords with the overall regulatory goals of RCRA, if such a distinction effectively imposes additional substantive requirements on the regulated community, it should be placed directly in the regulations. The regulations would then be subject to notice and comment, with appropriate participation by the regulated community.

We caution that we will not defer to an interpretation that implies language that simply cannot be found in the regulation. *Director, OWCP v. Mangifest,* 826 F.2d 1318, 1324 (3d Cir.1987); *Marshall v. Western Union Telegraph Co.,* 621 F.2d 1246, 1252–54 (3d Cir.1980). As we stated in *Mangifest,* "[h]aving written the regulations, the Director is responsible for their text. If the meaning is not clear on a reasonably objective basis, then the regulations should be changed so that no ambiguity remains." 826 F.2d at 1334 (Weis, J., concurring).