**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 19 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FARMERS TELEPHONE
COMPANY, INC.; TCT WEST, INC.;
TRI COUNTY TELEPHONE
ASSOCIATION, INC.,

               Petitioners,

       v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES
OF AMERICA,

               Respondents,

------------------------------

NATIONAL TELEPHONE
COOPERATIVE ASSOCIATION,
(NTCA); ALLTEL TELEPHONE
SERVICES CORPORATION
(ALLTEL); AT&T CORPORATION;
PUERTO RICO TELEPHONE
COMPANY ("PRTC");
GEORGETOWN TELEPHONE
COMPANY, LACKAWAXEN
TELEPHONE COMPANY,
LINCOLNVILLE TELEPHONE
COMPANY, INC.; SUMMIT
TELEPHONE COMPANY; WILTON
TELEPHONE COMPANY; MCI
TELECOMMUNICATIONS
CORPORATION,

               Intervenors.

No. 97-9522

BEAVER CREEK COOPERATIVE
TELEPHONE COMPANY,

Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

Respondent,

------------------------------

AT&T CORPORATION; NATIONAL
TELEPHONE COOPERATIVE
ASSOCIATION; PUERTO RICO
TELEPHONE COMPANY; ALLTEL
TELEPHONE SERVICES
CORPORATION ("ALLTEL"); LEAF
RIVER TELEPHONE COMPANY;
MONTROSE MUTUAL TELEPHONE
COMPANY; MCI
TELECOMMUNICATIONS
CORPORATION,

Intervenors.

No. 97-9547

Petitions for Review from the Federal Communications Commission
(AAD 95-77)

James R. Hobson, Donelan, Cleary, Wood & Maser, Washington, D.C. (Bruce S. Asay, Associated Legal Group, Cheyenne, Wyoming, on brief), for Petitioner.

Laurel R. Bergold, Federal Communications Commission, Washington, D.C. (Joel I. Klein, Assistant Attorney General, Robert B. Nicholson, and Andrea Limmer, U.S. Department of Justice, Washington, D.C., and Christopher J. Wright,

General Counsel, and John E. Ingle, Federal Communications Commission, on brief), for Respondent.

---

Before **PORFILIO, MAGILL,**[*] and **LUCERO,** Circuit Judges.

---

**MAGILL,** Circuit Judge.

---

Members of the National Exchange Carrier Association (NECA) have petitioned for review of a decision by the Federal Communications Commission (FCC), which interpreted 47 C.F.R. § 36.154(f) contrary to an interpretation of that same regulation by NECA. We affirm.

## I.

This case concerns the allocation of certain telephone company operating costs between federal and state jurisdictions. The rates charged by each telephone company are generally based on that company's operating costs. Because the FCC regulates rates for interstate telephone service and state utility commissions regulate rates for intrastate telephone service, it is necessary to separate and allocate each company's costs among interstate and intrastate jurisdictions. The

---

[*]Honorable Frank Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

process known as "jurisdictional separation" determines how these costs are allocated.

For the most part, telephone service within the United States is divided between local exchange carriers (LECs) and interexchange carriers (IXCs). LECs provide local telephone service to customers within a given geographic calling area (a local exchange), while IXCs enable customers in different local exchanges to call each other. Many items of each LEC's equipment are used for both interstate and intrastate telephone calls. For example, when connecting customers in the same state and same local exchange, the call originates at a home or office within a LEC, and proceeds through the LEC's network or cables, wires, circuits, and switches until it reaches the receiving party. Similarly, when connecting callers in different local exchanges and different states, the call originates at a home or office within one LEC, proceeds through the LEC's network until it is connected to an IXC, crosses state boundaries through the IXC's network until it reaches a second LEC, and is finally connected through the second LEC's network to the receiving party.

A LEC's cost of operating and maintaining equipment used for both interstate and intrastate telephone calls is classified as either traffic sensitive or non-traffic sensitive (NTS). Traffic sensitive costs are those that vary according to use in either interstate or intrastate service, and such costs typically are

-4-

allocated between those jurisdictions on that basis.  NTS costs, however, remain constant irrespective of use.  NTS costs include costs associated with equipment such as telephones, wiring within customers' homes or offices, and lines connecting individual telephones to local switching offices.

The FCC has struggled for years to develop a formula to allocate NTS costs between federal and state jurisdictions.  In 1970, the FCC adopted the "Ozark Plan" to allocate costs associated with NTS equipment.  Under the Ozark Plan, NTS costs were assigned to the interstate jurisdiction based on a formula that, in effect, shifted approximately 3.3 percent of NTS costs to the interstate jurisdiction for every 1 percent of interstate use.  This percentage figure was known as the subscriber plant factor (SPF).  See generally MCI Telecomms. Corp. v. FCC, 750 F.2d 135, 137-38 (D.C. Cir. 1984) (describing operation of Ozark Plan).  Between 1970 and 1982, the level of interstate calling increased substantially in relation to intrastate calling.  Because of the SPF multiplier, NTS costs were allocated to the interstate jurisdiction about three times as fast as actual interstate use.  By the early 1980s, some LECs' SPFs enabled them to allocate 85 percent of their NTS costs to the interstate jurisdiction.  Concerned about the ever-increasing amount of NTS costs being allocated to the interstate jurisdiction, the FCC decided in 1982 to freeze temporarily LECs' SPFs at 1981 levels.  This temporary freeze was upheld on review.  See id. at 140-42.

While the SPF freeze was in effect, the FCC developed a new way to allocate NTS costs that was not dependent on a LEC's SPF. Specifically, the FCC determined that LECs would be allowed to allocate a flat twenty-five percent of their NTS costs to the interstate jurisdiction. In an effort to prevent LECs' interstate allocations from dropping precipitously, the FCC elected to phase in the flat allocation rate over a period of eight years, ending in 1993. In addition, the FCC created a Universal Service Fund (USF) to assist high cost LECs in maintaining universal telephone service. The FCC describes the USF as "a formula that allocates an additional percentage of the costs of high cost companies to the interstate jurisdiction, over and above the basic 25 percent allocation. The additional percentage of interstate allocation [is] calculated each year depending upon whether the amount of any particular LECs' costs substantially exceed[] the national average. This high cost allocation is recovered through the USF, supported through usage charges contained in the access charge rates paid by the IXCs." Brief for FCC at 8; see also In re United States Tel. Ass'n, 6 FCC Rcd 1873, 1873 (1991) (USTA) (explaining that "[t]he USF was established to further mitigate the impact of the change to the 25 percent allocator for carriers with high SPF allocators and higher than average NTS costs" and that the USF essentially "assigns additional costs to the interstate jurisdiction for carriers with NTS costs that are significantly above the national average"). Like

the flat allocation rate, the USF was phased in over an eight-year period. See id.; see generally 47 C.F.R. § 36.641 (setting forth the manner for phasing in the USF after 1988). This scheme was affirmed on direct review. See Rural Tel. Coalition v. FCC, 838 F.2d 1307, 1313-17 (D.C. Cir. 1988).

During the phase-in period, LECs continued to use their respective SPFs to determine the interstate allocation for NTS costs, but each company's SPF was scheduled to diminish each year until 1993, when the interstate allocation was to be fixed at twenty-five percent. See 47 C.F.R. § 36.154(d)-(e) (describing manner in which SPF was to be calculated between 1988 and 1992). To prevent a LEC's interstate allocation from decreasing too rapidly, however, the FCC provided that no LEC's interstate allocation for NTS costs "shall decrease by a total of more than five percentage points from one calendar year to the next," when taking into account the combined effect of the reduction in SPF and the possible additional costs allocated to the interstate jurisdiction under the USF. Id. § 36.154(f)(1). Although the regulations promulgated by the FCC provide for the phase-in to be complete by 1993, this five percent limitation had the effect of preventing LECs with especially high SPFs from reaching the twenty-five percent flat rate within eight years. For example, a hypothetical LEC with a SPF of eighty-five percent in 1981 would still have an allowed interstate allocation of forty-five percent after eight years. In order to prevent these LECs from undergoing a severe hardship in

-7-

1993 when the flat rate was scheduled to take effect, i.e., to prevent the hypothetical LEC from reducing its interstate allocation from forty-five percent to twenty-five percent in one year, the FCC has allowed the transition period for such companies to extend beyond 1993. See USTA, 6 FCC Rcd at 1874 (explaining that for carriers that "will not reach the 25 percent allocator in the prescribed eight year transition period[,] . . . the transition would continue beyond the eight year period until the 25 percent allocator is reached without exceeding the limitation of five percentage points"); In re Waitsfield-Fayston Tel. Co., 5 FCC Rcd 5933, 5934 n.4 (Com. Car. Bur. 1990) ("Although the Commission determined that the SPF transition should be completed by 1993 for most carriers, it allowed the transition period to extend beyond 1993 for companies subject to the 5 percentage point limit on the reduction in their interstate allocation."); MTS & WATS Mkt. Structure, 50 Fed. Reg. 939 (1985) (adopting recommended decision in MTS & WATS Mkt. Structure, 49 Fed. Reg. 48325, 48338-39 & n.70 (1984), which explained that the five percent reduction limitation "would result in a 12 step transition in the case of a local company with a current frozen SPF of 85 percent").

The present dispute concerns whether the five percent annual reduction limitation set forth in § 36.154(f)(1) applies in perpetuity, even for LECs that have reached the twenty-five percent rate by 1993. Several LECs interpreted the

FCC's rulings in <u>USTA</u> and <u>Waitsfield-Fayston</u> as allowing them to take advantage of the five percent limitation even after they reached the twenty-five percent interstate allocator. These companies then limited reductions in their interstate allocation arising solely from reduced eligibility for USF payments. Take, for example, a hypothetical company that reached the twenty-five percent allocator in 1993 and that was unable to allocate any additional costs to the interstate jurisdiction under the USF. Assume also that this company had sufficiently high NTS costs in 1994 so that it could allocate an additional ten percent of such costs to the interstate jurisdiction under the USF, i.e., the company could allocate thirty-five percent of its NTS costs to the interstate jurisdiction in 1994. If that company's NTS costs lowered in 1995 and rendered it ineligible for USF support, that company would refuse to decrease its total interstate allocation that year by more than five percent. The company would therefore allocate thirty percent of its NTS costs to the interstate jurisdiction, in effect "raising" its interstate allocator from twenty-five percent to thirty percent.

NECA was one of the entities to determine that the five percent limitation operated in perpetuity. NECA is an independent organization established by the FCC for the purpose of preparing and filing access tariffs for member LECs that elect to participate in joint tariffs. <u>See</u> 47 C.F.R. § 69.601(a); <u>see also</u> <u>Allnet Communication Serv., Inc. v. NECA</u>, 965 F.2d 1118, 1119 (D.C. Cir. 1992).

Although NECA was established by the FCC, its board of directors and membership consist entirely of industry participants, see 47 C.F.R. § 69.602, it acts exclusively as an agent for its members, and it has no authority to perform any adjudicatory or governmental functions. See In re MTS & WATS Mkt. Structure, 97 F.C.C.2d 682, 755 (1983). NECA prepares and files joint tariffs on behalf of its members for access charges they collect from end-users and long-distance telephone companies for the use of wires and other equipment needed to make interstate long-distance telephone calls. Each member LEC charges the same access rate regardless of its actual costs and reports its access revenues and costs to NECA. NECA validates the data and then distributes the revenues among the member LECs from a pool on the basis of the actual costs of service. In 1991, NECA informed its members of its interpretation of § 36.154(f) and ordered them to follow this interpretation when computing their costs and revenues. NECA also followed this interpretation when distributing pool revenues among its members. None of NECA's members challenged its interpretation of § 36.154(f).

On May 12, 1995, the Florida Public Service Commission (Florida PSC) petitioned the FCC to clarify whether § 36.154(f) applied after 1993 or after a LEC had achieved a twenty-five percent interstate allocation. The FCC subsequently solicited public comment on Florida PSC's petition. The commenters offered the following three interpretations of § 36.154(f): (1) the

-10-

five percent limitation expired completely after 1993; (2) the five percent limitation applied in perpetuity, and thus continually operated to mitigate reductions in a LEC's USF support; and (3) the five percent limitation extended beyond 1993 but did not apply once a LEC reached the twenty-five percent interstate allocation. In March of 1996, the FCC's Accounting and Audits Division (AAD) staff subsequently issued an order that agreed with the third interpretation and clarified that the limitation could apply beyond 1993, but not with respect to LECs that had already reached the desired twenty-five percent interstate allocation. See In re Florida Pub. Serv. Comm'n Request for Interpretation of the Applicability of the Limit on Change in Interstate Allocation, Section 36.154(f) of the Comm'n's Rules, 11 FCC Rcd 10835 (AAD, Com. Car. Bur. 1996) (Staff Order).

After the AAD issued the Staff Order, NECA sent letters to its members requiring them to submit corrected data to it in light of the Staff Order's interpretation of § 36.154(f) for the period of time commencing April 1994 and ending in March 1996.[1] Several NECA members were concerned about these letters because, under the Staff Order's interpretation of § 36.154(f), they had improperly overallocated some of their NTS costs to the interstate jurisdiction

---

[1]Each NECA/member contract allows NECA a twenty-four month period of time in which to adjust its members' claimed interstate costs.

during that time period. They also were concerned that NECA would utilize the corrected data to require adjustments to previous pool distributions, which would require them to disgorge significant sums of money they had received by following NECA's prior interpretation of § 36.154(f).

Several NECA members adversely affected by the Staff Order and NECA's possible redistribution efforts filed requests for the FCC to review the Staff Order. After soliciting public comment, the FCC agreed with and affirmed the AAD's interpretation of § 36.154(f). See In re Florida Pub. Serv. Comm'n Request for Interpretation of the Applicability of the Limit on Change in Interstate Allocation, Section 36.154(f) of the Comm'n's Rules, 12 FCC Rcd 3406 (1997) (FCC Order). The FCC held that the language of the rule, its purpose, and the FCC's administrative precedent established that § 36.154(f) is a transitional rule that has no application after a LEC has reached a twenty-five percent interstate allocation. See id. at 3411-14.

The FCC also rejected several commenters' contentions that its ruling should apply only prospectively because the ruling adopted an interpretation of § 36.154(f) different from that subscribed to by NECA. See id. at 3416-17. According to the FCC, its ruling was merely interpretive and, thus, had no prohibitive retroactive effect. The fact that several parties had relied on NECA's faulty interpretation did not trouble the FCC because those parties could have, at

any time, requested the FCC to resolve any ambiguity in the rule. The FCC explained that when LECs rely on NECA's construction of a regulation, they bear the risk that NECA's construction may be incorrect. See id. The FCC then went on to require NECA to correct any improper data it had submitted based on its faulty interpretation of the rule. See id. at 3417. The FCC refused to consider the propriety of NECA's attempts to make intrapool adjustments "because no NECA pool members ha[d] sought redress" in the FCC proceedings for NECA's efforts. Id. at 3418.

NECA members who will be adversely affected by NECA's efforts to make intrapool adjustments then filed these petitions for review of the FCC Order.[2] The petitions were consolidated and, in November 1997, this appeal was placed in abeyance so that petitioners could seek clarification from the FCC as to whether the FCC Order was to have retroactive effect. Petitioners were particularly concerned about NECA's efforts to require intrapool adjustments for the two-year period of time immediately preceding the Staff Order. The FCC subsequently clarified that the Staff Order and the FCC Order merely interpreted § 36.154(f) and had no impermissible retroactive effect. See In re Beaver Creek Coop. Tel. Co., 13 FCC Rcd 17518, 17522 (Com. Car. Bur. 1998) (1998 Clarification Order).

_____

[2]Initially, one petition for review was filed in the Ninth Circuit and one was filed in this Circuit. The Ninth Circuit case was subsequently transferred to this Circuit.

-13-

The FCC refused to address whether NECA could retroactively apply the Staff Order and FCC Order to require intrapool adjustments, believing that issue "was a matter that NECA and the carriers should resolve in accordance with the terms of their contracts; it was not a matter that required a [FCC] edict." Id. In fact, the FCC asserted that neither the Staff Order nor the FCC Order required NECA to require intrapool adjustments between NECA members for any period of time preceding the Staff Order. See id. at 17524.

Unsatisfied with the 1998 Clarification Order, petitioners then resumed this appeal.[3] They first contend that the FCC's interpretation of § 36.154(f) is wrong. In the alternative, they contend that the FCC's interpretation cannot be applied retroactively, and they ask this court to order the FCC to prohibit NECA from requiring intrapool adjustments for any period of time prior to the issuance of the Staff Order.

## II.

We must give substantial deference to the FCC's interpretation of its own regulations. See Rocky Mountain Radar, Inc. v. FCC, 158 F.3d 1118, 1123 (10th Cir. 1998), cert. denied, 119 S. Ct. 1045 (1999). "'Our task is not to decide which among several competing interpretations best serves the regulatory purpose.

---

[3]Petitioners have not sought review of the 1998 Clarification Order.

Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).  Specifically, we will give effect to the FCC's interpretation "so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations."  Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991) (citation and internal quotation marks omitted).  "In other words, we must defer to the [FCC's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation."  Thomas Jefferson Univ., 512 U.S. at 512 (internal quotation marks omitted).  "'This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program . . . .'"  Rocky Mountain Radar Co., 158 F.3d at 1123 (quoting Thomas Jefferson Univ., 512 U.S. at 512).

On appeal, petitioners first challenge the FCC's determination that § 36.154(f) ceases to apply to a LEC after that LEC has reached the twenty-five percent interstate allocation set forth in § 36.154(c).  After careful review, we uphold that the FCC's interpretation of § 36.154(f).

-15-

Both the plain language of and the policy underlying § 36.154[4] suggest that the five percent reduction limitation set forth in § 36.154(f) ceases to apply after a LEC has reached the twenty-five percent interstate allocation factor provided for in § 36.154(c). It is undisputed that the FCC promulgated § 36.154 for the express purpose of regulating the manner in which LECs would transition from using SPF to allocate their NTS costs to the interstate jurisdiction to using a flat-rate twenty-five percent allocation factor. Section 36.154 provides that twenty-five percent of a LEC's NTS costs shall be allocated to the interstate jurisdiction "[e]xcept as provided in § 36.154 (d) through (f)." 47 C.F.R. § 36.154(c). Subsections (d), (e), and (f) spell out the manner in which LECs are to transition from their frozen SPFs to the twenty-five percent allocation factor. Subsections (d) and (f) set forth mathematical formulae to apply during the transition period. See 47 C.F.R. § 36.154(e) (explaining that subsections 36.154(d) and (f) describe "transitional allocations"). By its very terms, § 36.154(f) applies only if a LEC's interstate allocation for NTS costs decreases "from one calendar year to the next as a result of the combined operations of [47 C.F.R.] §§ 36.154(d) and 36.641(a)

_____

[4]Although petitioners' challenge focuses on the FCC's interpretation only of § 36.154(f), we analyze that particular subsection in light of § 36.154 in its entirety. Cf. Colorado Dep't of Labor & Employment v. United States Dep't of Labor, 875 F.2d 791, 797 (10th Cir. 1989) ("In determining whether an agency's interpretation is plainly erroneous or inconsistent with the regulation, we follow the principle of regulatory construction that . . . a court cannot concentrate on individual terms and ignore a consideration of the context in which the term appears." (internal quotation marks omitted)).

and (b)."  47 C.F.R. § 36.154(f)(1).  This is significant in light of the fact that §

36.154(d) is merely "transitional," id. § 36.154(e), and that § 36.641, which

codifies the eight-year phase-in period of the USF, is entitled "Transition" and is

placed under the heading "Transitional Expense Adjustment."  See Almendarez-

Torres v. United States, 523 U.S. 224, 234 (1998) ("We also note that the title of

a statute and the heading of a section are tools available for the resolution of a

doubt about the meaning of a statute." (internal quotation marks omitted)).

Section 36.154(e)'s description of § 36.154(f) as a transitional rule, when read in

conjunction with § 36.154(f)'s reference to the transitional rules set forth in §§

36.154(d) and 36.641, supports the FCC's determination that § 36.154(f) is merely

transitional and does not apply after a LEC has successfully transitioned to the

twenty-five percent allocation factor.

The purpose underlying the promulgation of § 36.154(f), as well as FCC

precedent, also supports the FCC's interpretation of that regulation.  The FCC

enacted § 36.154(c)-(f) for the express purpose of setting forth the manner in

which LECs would transition from using SPF to a twenty-five percent flat rate

augmented by high-cost assistance under the USF.  See MTS & WATS Mkt.

Structure, 49 Fed. Reg. at 48338-39.  It stands to reason that the transitional rule

set forth in § 36.154(f) remains effective only until the transition is completed,

i.e., when a LEC has achieved the flat-rate twenty-five percent allocation to the

interstate jurisdiction under § 36.154(c). Indeed, the FCC interpreted § 36.154(f) in this manner as early as 1991, see USTA, 6 FCC Rcd at 1874 (explaining that the FCC adopted § 36.154(f) to "provide for an orderly transition to the 25 percent allocator"), and the Supreme Court has held that "the consistency of an agency's position is a factor in assessing the weight that position is due." Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).

Petitioners contend that the language of § 36.154(f) suggests that the five percent limitation applies even after a LEC has reached the twenty-five percent base allocator. They point out that § 36.154(f) explicitly refers to § 36.641(a), which explains that the USF "expense adjustment for 1993 and subsequent years shall be the amount computed in accordance with § 36.631." 47 C.F.R. § 36.641(a). Because § 36.631 provides for USF expense adjustments to be made on a yearly basis after 1989, see id. § 36.631(e), petitioners contend that the five percent limitation also must be made on a yearly basis to account for fluctuations in USF expense adjustments, even if a LEC has already reached the twenty-five percent interstate allocation. We disagree.

Petitioners' argument ignores the fact that § 35.154(f) is strictly a "transitional" rule, id. § 36.154(e), and that the transition is complete once a LEC reaches the twenty-five percent allocator. Moreover, adopting petitioners' proposed construction of § 36.154(f) would not only vitiate the purpose

-18-

underlying the promulgation of § 36.154(f), but also that of the USF. We use the following example of a hypothetical LEC employing petitioners' proposed interpretation of § 36.154(f) to demonstrate the fallacy of their argument. Assume a LEC has reached the twenty-five percent allocator in 1993 and that the LEC receives no funds from the USF, i.e., the LEC is not entitled to allocate additional NTS costs to the interstate jurisdiction. Assume also that the LEC incurs enormous NTS costs in 1994 which entitle it to take advantage of the USF and allocate an additional fifteen percent of its NTS costs to the interstate jurisdiction that year.[5] For 1994, therefore, the LEC would allocate a total of forty percent (twenty-five percent flat rate plus the additional fifteen percent) of its NTS costs to the interstate jurisdiction. Next assume that the LEC's NTS costs drop precipitously in 1995 so that it is no longer entitled to allocate additional NTS costs to the interstate jurisdiction under the USF that year. Petitioners' interpretation of § 36.154(f) would entitle that LEC to reduce its interstate allocation from forty percent to thirty-five percent to account for this loss of USF funding, rather than back to the twenty-five percent flat rate. Therefore, and despite being in the same position (cost-wise) as in 1993, the LEC would be allocating an additional ten percent of its NTS costs over the twenty-five percent

---

[5]For example, a storm could hit the LEC's area, requiring the LEC to repair and replace a substantial portion of its NTS equipment.

rate to the interstate jurisdiction, notwithstanding its ineligibility to allocate any additional NTS costs to the interstate jurisdiction under the USF. In effect, the LEC's eligibility to make additional allocations to the interstate jurisdiction under the USF in 1994 enables it continue making additional allocations to the interstate jurisdiction in the future, even though it is no longer eligible to do so under the USF. This undermines the purpose of the USF, which allows LEC's to make addition allocations to the interstate jurisdiction only on a yearly, as needed basis.

Because we find that the FCC's interpretation is reasonable, we affirm that interpretation. Even assuming that petitioners' alternative interpretation of § 36.154(f) also is reasonable, a proposition with which we disagree, we give the FCC's interpretation controlling weight because it is neither plainly erroneous nor inconsistent with the purpose or text of the regulation.

## III.

Petitioners next request this court to enjoin the FCC from applying its interpretation of the rule retroactively.[6] According to petitioners, the FCC's interpretation of § 36.154(f) constitutes a new rule because it overrules NECA's interpretation of that regulation, which they were bound to follow. The FCC

---

[6]The FCC required NECA to calculate and submit corrected data for each year in which NECA required its members to follow its faulty interpretation of § 36.154(f). See FCC Order, 12 FCC Rcd at 3417.

-20-

rejoins that its ruling is merely interpretive, that NECA's interpretation was never binding on the FCC, and that petitioners' retroactivity concerns are without merit. In the alternative, the FCC contends that its ruling should be applied retroactively.

We agree with the FCC that the question of retroactivity does not arise in the present case because its ruling is merely interpretive. "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive."  Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989); see also McKenzie v. Bowen, 787 F.2d 1216, 1222 (8th Cir. 1986) ("An interpretive rule . . . clarifies or explains existing law or regulations.").  Here, the FCC Order clarifies and explains existing regulations and petitioners' allocation obligations under those regulations.  In reaching its order, the FCC did not overrule or disavow any controlling precedent.[7]  See Borden, Inc. v. NLRB, 19 F.3d 502, 510 (10th Cir. 1994) (holding that there are no retroactivity concerns when an agency's ruling does not "overrule[] any controlling precedent upon which [petitioner] relied to its detriment").  Nor did the FCC alter petitioners' existing rights or obligations under the allocation regulations.  Rather, the FCC's ruling

_____

[7]We acknowledge that the Staff Order and FCC Order disagreed with NECA's interpretation of § 36.154(f).  However, as explained infra, petitioners have failed to demonstrate that NECA's interpretation of that regulation was in any way binding on or approved by the FCC.

-21-

"merely clarified what those existing rights and obligations had always been." Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 113 (3d Cir. 1996). Accordingly, we find that the FCC's ruling has no prohibited retroactive impact. See Manhattan Gen'l Equip. Co. v. Commissioner, 297 U.S. 129, 135 (1936) (explaining that an agency ruling interpreting a statute "is no more retroactive in its operation than is a judicial determination construing and applying a statue to a case in hand").

Petitioners contend that the FCC's ruling did alter their legal rights and obligations, and that retroactivity concerns therefore exist, because they were contractually required to follow NECA's interpretation of § 36.154(f) prior to the Staff Order. This argument ignores the fact that NECA is an agent of its members and has no authority to issue binding interpretations of FCC regulations. NECA is neither an independent federal agency nor a subagency of the FCC. NECA's board of directors and membership consist entirely of industry participants. See 47 C.F.R. § 69.602. When the FCC created NECA, it made clear that NECA acted exclusively as an agent for its members and had no authority to perform any adjudicatory or governmental functions. See In re MTS & WATS Mkt. Structure, 97 F.C.C.2d at 755 (explaining that NECA "will not be performing any adjudicatory or other governmental functions; it will be preparing tariffs as an agent for the carriers"); see also Allnet, 965 F.2d at 1119 ("NECA prepares and

files joint tariffs on behalf of its members . . . ."). The pertinent regulations do not provide NECA with any authority to issue binding interpretations of FCC regulations. See 47 C.F.R. § 69.603 (describing NECA's functions). The FCC has specifically ruled that it retains "full authority to review NECA's tariff filings" and that "LECs that disagree with NECA's interpretations of [FCC] rules are free to present their arguments to the [FCC], either in comments on those filings or petitions for declaratory rulings." In re Safeguards to Improve the Admin. of the Interstate Access Tariff and Revenue Distrib. Processes, 10 FCC Rcd 6243, 6260 (1995). Petitioners have not pointed to any evidence, statute, or regulation suggesting that NECA has the ability to bind the FCC to its interpretation of an FCC regulation, much less that NECA's interpretation is binding on all regulated entities absent a contrary FCC interpretation. Consequently, we hold that the FCC's ruling did not affect petitioners' legal rights and obligations under the pertinent FCC regulations.

Even assuming that retroactivity concerns are implicated here, we are not persuaded that the FCC Order should not be applied retroactively. This court uses "a five-factor balancing test to determine whether an agency's ruling should be applied retroactively." Borden, 19 F.3d at 511. These factors are (1) "[w]hether the case is one of first impression;" (2) "[w]hether the new rule is an abrupt departure from well-established practice or merely an attempt to fill a void in an

-23-

unsettled area of law;" (3) "[w]hether and to what extent the party against whom the new rule is applied relied on the former rule;" (4) "[w]hether and to what extent the retroactive order imposes a burden on a party;" and (5) "[w]hether and to what extent there is a statutory interest in applying a new rule despite reliance of a party on an old standard." Id. In applying this multi-factor test, "there has emerged [a] basic distinction . . . between (1) new applications of law, clarifications, and additions, and (2) substitution of new law for old law that was reasonably clear." Williams Natural Gas Co. v. FERC, 3 F.3d 1544, 1554 (D.C. Cir. 1993) (internal quotation marks omitted). "[R]etroactivity in the former case is natural, normal, and necessary, a corollary of an agency's authority to develop policy through case-by-case adjudication . . . ." Id. (citation and internal quotation marks omitted); see also Beazer East, Inc. v. United States EPA, 963 F.2d 603, 610 (3d Cir. 1992) ("As Justice Scalia has recently said, 'where legal consequences hinge upon the interpretation of statutory requirements, and where no preexisting interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication.'" (citation omitted)). In contrast, the latter situation "may give rise to questions of fairness, [rendering it] necessary to deny retroactive effect to a rule announced in an agency adjudication in order to protect the settled expectations of those who had relied on the preexisting rule." Williams Natural Gas Co., 3 F.3d at 1554.

Consequently, "retroactivity is appropriate when the agency's ruling represents a new policy for a new situation, rather than being a departure from a clear prior policy." Id. (internal quotation marks omitted).

Although the present case is one of first impression (factor one),[8] we believe that this case falls squarely within the precedents authorizing retroactivity for agency rules that do not represent a shift from a clear prior policy (factor two). The question here is whether NECA's interpretation (which carried the day since 1991 so far as petitioners are concerned) should somehow be imputed to the FCC as "well-established" policy that was overruled by the FCC Order. The answer is "no." As explained above, petitioners have failed to point to any authority suggesting that NECA may issue definitive interpretations of FCC regulations. Absent any such authority, petitioners cannot now complain that their reliance on NECA's interpretation should prevent the FCC from applying its ruling retroactively. To the extent that NECA's interpretation was a well-settled policy, it was so only with respect to NECA members, not to other LECs, and these members could have sought a definitive ruling from the FCC. It was never a well-settled policy of the FCC with respect to all LECs. Accordingly, we find that the FCC's ruling did not represent a departure from clear prior policy.

---

[8]Prior to the Staff Order, the FCC had never ruled on the precise scope of § 36.154(f) as it applied to companies after they reached the twenty-five percent allocation factor.

The mere fact that petitioners relied on NECA's interpretation to their detriment does not satisfy the third and fifth factors of the five-factor test. Although petitioners unquestionably relied on NECA's interpretation of the rule, they did not rely on an FCC endorsement of that interpretation. We are not inclined to agree that a petitioner's misplaced reliance on his agent's construction of an agency regulation should prevent that agency from ever "retroactively" enforcing its interpretation of the regulation because it differs from that of the petitioner's agent.

We do agree with petitioners that a retroactive application of the FCC's interpretation will impose a burden upon them (factor four). However, this burden arises not from their reliance on any previous FCC policies, but from their reliance on NECA's faulty interpretation of the regulation. The burden is no different from that of other parties who act in reliance on their own, or their agent's, i.e., their lawyer's, interpretation of a statute or regulation but later find out (via a court or agency decision) that their interpretation was wrong. Cf. Manhattan Gen'l Equip. Co., 297 U.S. at 135 (explaining that an agency ruling interpreting a statute "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand").

After balancing the five factors, we conclude that the FCC's ruling may be applied retroactively to these petitioners. Simply put, we do not believe that

-26-

NECA's erroneous interpretation of § 36.154(f), or petitioners' blind-faith reliance thereon, constitutes a basis for precluding retroactive application of the FCC's interpretation of the regulation. Consequently, we reject petitioners' argument to the contrary.

## IV.

Finally, petitioners request this court to enjoin NECA from requiring intrapool adjustments for any period of time prior to the issuance of the Staff Order, claiming that NECA should be bound by its faulty interpretation of § 36.154(f) for the relevant time period. However, petitioners never requested a ruling from the FCC concerning NECA's actions, and the FCC specifically refused to opine about the propriety of NECA's actions. See FCC Order, 12 FCC Rcd at 3418 ("We decline to address whether intrapool adjustments should be required because no NECA pool members have sought redress for the damage.").[9] Moreover, we point out that NECA was not a party to the proceedings before the FCC, and petitioners have not sought to join NECA as a party on appeal. Accordingly, we refuse to address the merits of petitioners' request on appeal.[10]

_____

[9]In the 1998 Clarification Order, the FCC clarified that it "has not required NECA to require intrapool adjustments for periods prior to March 22, 1996." 13 FCC Rcd at 17524. Petitioners have not sought review of this order.

[10]We do not, however, foreclose petitioners from seeking relief against NECA in other
(continued...)

See Oyler v. Allenbrand, 23 F.3d 292, 299 n.8 (10th Cir. 1994) (refusing to consider issue that was raised for first time on appeal).

**V.**

For the foregoing reasons, the FCC's ruling is AFFIRMED.

---

[10](...continued) proceedings.